**INDEPENDENT PETROCHEMICAL CORPORATION, et al.,**
**Appellants,**

**v.**

**AETNA CASUALTY AND SURETY COMPANY, et al. (Two Cases).**

Nos. 89–5367, 89–5368.

United States Court of Appeals, District of Columbia Circuit.

Argued March 14, 1991.

Decided Sept. 13, 1991.

Rehearing Denied Nov. 5, 1991.

---

John H. Gross, with whom Jerold Oshinsky, Sherry W. Gilbert, Robert H. Shulman and Stephan G. Weil were on the brief, for appellants in 89–5367 and 89–5368.

Dennis M. Flannery, with whom W. Scott Blackmer was on the brief, for appellee Ins. Co. of North America, in 89–5368.

Paul L. Friedman, with whom Anne D. Smith was on the brief, for appellee, Pacific Indem. Co., in 89–5367. Lloyd H. Randolph also entered an appearance for appellee.

Richard B. Stewart, Asst. Atty. Gen., Anne S. Almy, Steven R. Baer and Catherine M. Flanagan, Attys., Dept. of Justice, were on the brief, for amicus curiae, in 89–5367 and 89–5368 urging that the Order granting Summary Judgment to Independent Petrochemical Corporation's insurers be reversed.

James P. Schaller and Timothy R. Dingilian entered appearances for appellees, American Home Assur. Co., Insurance Co. of the State of Pennsylvania; and Lexington Ins. Co., in 89–5367 and 89–5368.

James E. Rocap, III, Niki Kuckes and Martin D. Minsker entered appearances for appellee, Aetna Cas. and Surety Co., in both cases.

Peter J. Schlesinger entered an appearance for appellee, The Travelers Indem. Co., in both cases.

Robert E. Heggestad entered an appearance for appellee, Harbor Ins. Co., in both cases.

Joseph F. Cunningham entered an appearance for appellee, Stonewall Ins. Co., in both cases.

James W. Greene entered an appearance for appellees, American Re–Insurance Co., et al., in both cases.

Richard H. Gimer, Potomac, Md., Stephen L. Humphrey, Kathryn A. Underhill, and Richard A. Ifft entered appearances for appellees, American Employers' Insurance Co. and Employers' Commercial Union Ins. Co. in No. 89–5368.

Michael Nussbaum and Martin R. Baach entered appearances for appellee, certain underwriters at Lloyd's London and certain

companies in the London market, in No. 89–5368.

Before EDWARDS, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This diversity case reaches us on appeal after eight years of litigation in the district court about matters that have no connection whatever to the District of Columbia. The litigation, which involves a wide array of complex issues, is continuing. *See Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 654 F.Supp. 1334 (D.D.C.1986). With respect to two claims, the court below entered final judgments pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, after finding "no just reason for delay." The first of these claims presents the question whether, under the law of the State of Missouri, insurance policies providing reimbursement for "damages" awarded against the insured include sums representing the cost of remedying environmental harm for which the insured is legally responsible. The second claim, also governed by state law, raises the question whether a particular policy issued by Pacific Indemnity Company continued to cover Independent Petrochemical Corporation after it became a wholly-owned subsidiary of plaintiff Charter Oil Company, which is owned by plaintiff The Charter Company.

With respect to the first claim, the facts, as set forth by the district court, are these. In 1971, Independent Petrochemical agreed to assist one of its Missouri customers in disposing of waste material containing "dioxin," a family of chemical compounds that, in sufficient concentrations, may cause serious harm to humans, animals and plants. Independent Petrochemical hired Russell M. Bliss, an independent contrac-

tor, to do the job. Bliss transported more than 20,000 gallons of the hazardous waste in his tank trucks to a facility in Frontenac, Missouri, where he mixed it with waste oil and emptied the resulting mixture into storage tanks. Bliss later sprayed the mixture to suppress dust at various sites in eastern Missouri. 654 F.Supp. at 1339.

In order to cure the harm resulting from Bliss's activities, the federal government and the State of Missouri undertook environmental cleanup activities costing millions of dollars. In an action by the United States seeking reimbursement from Bliss, Independent Petrochemical, its affiliated corporations and others, the United States District Court for the Eastern District of Missouri held Independent Petrochemical jointly and severally liable for these costs under section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607(a). *United States v. Bliss*, 667 F.Supp. 1298 (E.D.Mo.1987). Missouri also sued Independent Petrochemical to recover its cleanup costs. *Missouri v. Independent Petrochemical Corp.*, No. 83–2670–C (E.D.Mo. filed Nov. 23, 1983). Independent Petrochemical's potential joint liability is estimated to be at least $96 million. The company is insolvent.[1] Under a plan of liquidation approved by the United States Bankruptcy Court for the Middle District of Florida, Independent Petrochemical will continue to defend the CERCLA claims against it and pursue coverage from its insurers.

Between 1971, when Independent Petrochemical agreed to assist its customer in disposing of the hazardous waste material, and 1983, when this case began, Independent Petrochemical purchased 67 Comprehensive General Liability policies from the 23 insurers named as defendants in the

---

1. Independent Petrochemical, The Charter Company and Charter Oil initiated chapter 11 proceedings in the United States Bankruptcy Court for the Middle District of Florida in 1984. That court approved a settlement of the federal

government's claims against The Charter Company and Charter Oil, and approved each company's plan of reorganization. The United States later dismissed its claims against the two

court below.[2] The Comprehensive General Liability Policy is a standard-form insurance policy drafted by insurance representatives under the sponsorship of the Insurance Service Office, a trade association that provides drafting assistance to about 3,000 insurers. The parties agree that each of these 67 policies contained language such as the following:

> The [insurance] company will pay on behalf of the insured [Independent Petrochemical] all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence....

None of the policies defined the term "damages."

In November 1983, two weeks before Missouri brought its CERCLA action, Independent Petrochemical and its affiliated corporations brought this suit for a declaratory judgment. Jurisdiction rested on diversity of citizenship. 28 U.S.C. § 1332. Although Independent Petrochemical had its principal place of business in Missouri, where the incidents giving rise to this dispute occurred, and although none of the parties are incorporated in the District of Columbia, the case could be brought here apparently because the District of Columbia's Superintendent of Insurance accepts service of process for the defendant insurers (D.C.CODE ANN. § 35–423), which is sufficient to lay venue under the expansive provisions of 28 U.S.C. § 1391(a) & (c). Among other claims, plaintiffs sought a judgment that the provision just quoted obligates Independent Petrochemical's insurers to cover liability for environmental cleanup costs incurred by the United States and Missouri.

While this litigation proceeded, the United States Court of Appeals for the Eighth Circuit, sitting *en banc,* held in a five-to-three decision that under Missouri law "the term 'damages' in the standard-form comprehensive general liability insurance ... policy does not include cleanup costs" (*Continental Ins. Cos. v. Northern Pharmaceutical & Chemical Co.,* 842 F.2d 977, 979 (8th Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (*"NEPACCO"*)). *NEPACCO* not only dealt with the identical issue now facing us, but also arose out of the same factual circumstances. The hazardous waste Bliss handled under his agreement with Independent Petrochemical was NEPACCO's. The Eighth Circuit's decision relieved Continental Insurance Company of any contractual duty under the policy to reimburse NEPACCO for cleanup costs incurred by the state and federal governments, costs NEPACCO was legally obligated to pay under CERCLA.

Because *NEPACCO* was rendered by the "home circuit" for Missouri, the district court in this case treated the decision with deference. Finding no basis for concluding that the Eighth Circuit had ignored clear signals from the Missouri courts, the court followed the *NEPACCO* "precedent with respect to those policies not containing a choice-of-law provision directing the application of the law of some other state." *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.,* No. 83–3347, mem. op. at 220 (D.D.C. Sept. 7, 1988).[3] The court therefore granted the insurers' motions for partial summary judgment.[4]

I

Our duty in this case, as in any diversity case, is to "ascertain and apply the state law" (*Huddleston v. Dwyer,* 322 U.S. 232, 236, 64 S.Ct. 1015, 1018, 88 L.Ed. 1246 (1944)). The parties agree that under the

---

companies. *See United States v. Bliss,* 667 F.Supp. 1298, 1302 n. 1 (E.D.Mo.1987).

**2.** Only 21 of the insurers have entered appearances in this court. The two that have not appeared are in liquidation.

**3.** Before *NEPACCO,* the district court had viewed the term "damages" under Missouri law as including cleanup costs. *Independent Petro-*

chemical Corp. v. Aetna Casualty & Surety Co.,* 654 F.Supp. 1334, 1359 (D.D.C.1986).

**4.** Several other policies were expressly governed by the law of New York. The district court, relying on two New York trial court decisions, held that cleanup costs were included within the term "damages" in those policies.

District of Columbia's choice of law rules, Missouri law governs the interpretation of the insurance policies and of the term "damages." *See Bledsoe v. Crowley,* 849 F.2d 639, 641 (D.C.Cir.1988). The district court so held, the parties have not objected, and, finding no apparent error, we also view Missouri law as controlling. *BWX Electronics, Inc. v. Control Data Corp.,* 929 F.2d 707, 710 (D.C.Cir.1991). Missouri's appellate courts, however, have not spoken to the issue before us.[5] The state's highest court had an opportunity to do so when the Third Circuit certified this question to it, but the Missouri Supreme Court found the certification statute (Mo.Ann. Stat. § 477.004 (Vernon Supp.1990)) to be unconstitutional. *See Jones Truck Lines, Inc. v. Transport Ins. Co.,* No. 72650 (Mo. July 13, 1990).

Because Missouri law thus remains unsettled, and because the Eighth Circuit is the "home" circuit for Missouri, the defendant insurers urge us simply to adhere to the *NEPACCO* decision, much as the district court did. One rather obvious consideration favors that course. If our interpretation of Missouri law were at odds with the Eighth Circuit's, only the Supreme Court could resolve the resulting conflict, in the absence of a Missouri appellate court ruling. While the Supreme Court has on occasion reviewed decisions in diversity cases to determine whether a federal appellate court properly applied settled principles in ascertaining state law, *see, e.g., Exxon Co., U.S.A. v. Banque de Paris et*

*des Pays–Bas,* 488 U.S. 920, 109 S.Ct. 299, 102 L.Ed.2d 319 (1988) (order), such occasions are understandably infrequent. Intercircuit conflicts could be entirely avoided if, after the first federal appellate court ruled, other federal courts of appeals simply followed that ruling without exercising any independent judgment. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), however, requires federal courts in diversity cases "to determine how the highest court of the state would decide," C. WRIGHT, FEDERAL COURTS 373 (4th ed. 1983); since a state's highest court would not be bound by a federal court decision interpreting state law, one might question whether other federal courts of appeals may be. Another consideration is present when the initial federal decision is that of the home circuit, which may be thought to be experienced in interpreting the particular state's laws, even though the "very essence of *Erie* is that the bases of state law are presumed to be communicable" to any federal judge. *Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991).

■ The potential for forum-shopping within the federal judicial system caused by intercircuit conflicts over the meaning of state law, and the assumption of expertise on the part of the home circuit, have led us to conclude that a home circuit's view of state law is entitled to deference. *Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119, 125–26 (D.C.Cir.1986).[6] *See also*

---

5. The Circuit Court of the City of Saint Louis, in an opinion rendered after the decision here, held that an insurer's obligation to pay "damages" includes reimbursement for environmental clean-up costs incurred by the government. *Cooper Indus., Inc. v. American Mutual Liability Ins. Co.,* No. 864–00284, mem. op. at 36–37 (Mo. Cir.Ct. Sept. 8, 1989). Rejecting the Eighth Circuit's view in *NEPACCO,* the court determined that under Missouri principles of insurance contract interpretation, the word "damages" unambiguously includes clean-up costs sought by the government under CERCLA, 42 U.S.C. § 9607(a). This decision, however, is not controlling on the question of Missouri law because it was not rendered by the state's court of last resort, or an intermediate appellate court. *See Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18

L.Ed.2d 886 (1967); *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).

6. In a diversity case, we stand in the shoes of the court of the forum state, which here is the District of Columbia Court of Appeals. *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 203, 76 S.Ct. 273, 276, 100 L.Ed. 199 (1956). *Erie* had two objectives—"discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1965). Both aims were accomplished by requiring uniformity between "coordinate state and federal courts sitting side by side." *Klaxon v. Stentor Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). This may suggest that the extent of our obligation to defer to the Eighth Circuit would depend on what weight

*Waters v. American Auto. Ins. Co.*, 363 F.2d 684, 689 (D.C.Cir.1966). Deference is one thing; blind adherence quite another. Under *Abex*, we will not follow another circuit's decision if that court "ignored clear signals emanating from the state courts" or *"clearly misread* state law." 790 F.2d at 125–26 (emphasis in original), citing with approval *Factors, Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir.1981), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982). While the instances when this has occurred will be "rare" (790 F.2d at 125), we believe the Eighth Circuit's decision in *NEPACCO* falls within the *Abex* exception.

*NEPACCO* begins with an analysis of Missouri's principles of insurance contract interpretation. The court determined that under Missouri law the language of an insurance policy is to be given "the meaning that would ordinarily be understood by the lay[person] who bought and paid for the policy." *NEPACCO*, 842 F.2d at 985, quoting *Robin v. Blue Cross Hosp. Serv., Inc.*, 637 S.W.2d 695, 698 (Mo.1982). On this score, the court was clearly correct. "Meaning of words or terms in an insurance contract is tested by common understanding and speech of men." *Whited v. National Western Life Ins. Co.*, 526 S.W.2d 364, 367 (Mo.App.1975); *see also Greer v. Zurich Ins. Co.*, 441 S.W.2d 15, 27 (Mo.1969); *Wehmeier v. State Farm Mut. Auto. Ins. Co.*, 556 S.W.2d 739, 740 (Mo. App.1977). The court also ruled that under Missouri law if the language is unambiguous, the insurance policy is to be enforced strictly in accordance with its plain and ordinary meaning; if it is ambiguous—that is, "reasonably open to different constructions"—then it should be construed against the insurer. 842 F.2d at 985. Here too the Eighth Circuit was on solid ground. When language is susceptible to more than one plain and ordinary interpretation, "that most favorable to the insured must be adopted." *Krombach v. Mayflower Ins.*

*Co.*, 785 S.W.2d 728, 731 (Mo.App.1990). A technical meaning that is in conflict with common understanding shall not be applied "unless it plainly appears that the technical meaning is intended." *Krombach*, 785 S.W.2d at 731; *see also Greer*, 441 S.W.2d at 27.

Our difficulty with *NEPACCO* is that it fails to apply these Missouri law principles. Rather than relying on the common understanding of the word "damages," the court proceeded to analyze how that term is used "by astute insurance specialists or perspicacious counsel" (*Hammontree v. Central Mut. Ins. Co.*, 385 S.W.2d 661, 666 (Mo. App.1965)). Relying on *Maryland Casualty Co. v. Armco*, 822 F.2d 1348 (4th Cir. 1987), which interpreted "damages" based on "the legal, technical meaning" (*id.* at 1352), the court concluded that "damages" unambiguously refers to compensatory relief but does not include equitable monetary relief. *NEPACCO*, 842 F.2d at 985–86. Lawsuits by the government seeking reimbursement or restitution for environmental cleanup costs "are essentially equitable actions for monetary relief" (*id.* at 987). Therefore, the court found such costs to be outside the realm of insurance policies indemnifying for "sums" to be paid "as damages."

As the *NEPACCO* majority itself acknowledged, the lay insured would not distinguish between legal and equitable relief when construing "damages." 842 F.2d at 985. The term broadly refers to "the estimated reparation in money for detriment or injury sustained," or "compensation or satisfaction imposed by law for wrong or injury." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 571 (1981). The Missouri layperson would expect "damages" to encompass all financial liabilities one is obligated to pay as a result of another's loss. At least one Missouri trial court has interpreted "damages" this way in a case involving the same insurance policy language at issue here. *Cooper Indus., Inc. v. Ameri-*

---

the District of Columbia Court of Appeals would give to that court's ruling in the absence of governing Missouri precedent. *See* 19 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4507, at 112 (1982). But the local courts in the District of Columbia have not spoken to this issue; accordingly there is no indication that they would treat the matter of deference any differently than the rule set forth in our decision in *Abex.*

*can Mutual Liability Ins. Co.*, No. 864–00284, mem. op. at 33 (Mo.Cir.Ct. Sept. 8, 1989). Before Missouri adopted model jury instructions, in decisions concerning the adequacy of trial courts' jury instructions on the issue of damages in negligence actions, Missouri courts defined "damages" as recompense or reparation for injury sustained. *See Jackson v. St. Louis–San Francisco R. Co.*, 357 Mo. 998, 211 S.W.2d 931, 936 (1948); *Lord v. Austin*, 39 S.W.2d 575, 578 (Mo.App.1931). Under Missouri's model instructions, recovery reflecting the cost of restoring or repairing property is also understood as a form of "damages." *Cf. Jack L. Baker Cos. v. Pasley Mfg. & Distrib. Co.*, 413 S.W.2d 268, 272–73 (Mo. 1967). As the Missouri trial court observed in *Cooper Industries*, these jury instruction cases are significant because Missouri courts "were confronted with the meaning of the term damages as it would be understood by laymen—the jury." *Cooper Industries*, mem.op. at 34–35.

Liability for environmental cleanup costs quite naturally fits this common and ordinary understanding of damages. Missouri and the United States "are not mere contractors who act out of expectation of recompense for their cleanup work." *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 829, 274 Cal.Rptr. 820, 836, 799 P.2d·1253, 1269 (1990). Their out-of-pocket expense in cleaning up the property contaminated by dioxin is a loss or detriment "incurred as a matter of public duty" and constitutes harm to the public fisc. *Id.* Independent Petrochemical's liability compensates for that harm.

Our research reveals that, with the exception of *NEPACCO*, in every case in which the operative state's rules of insurance contract interpretation required—as Missouri's does—resort to the common and ordinary understanding of language, the word "damages" has been construed to cover reimbursement for environmental response costs incurred by a government.[7] These decisions are discussed in depth by Judge Becker, in his opinion for the court in *New Castle County v. Hartford Accident & Indemnity Co.*, 933 F.2d 1162, 1187–90 (3d Cir.1991). Decisions construing the term differently were apparently governed by state rules of interpretation under which the technical or legal meanings of language controlled.[8]

Had the record revealed that Independent Petrochemical intended to be bound by the technical meaning of "damages," the common and ordinary understanding of that term would not control. *Krombach*, 785 S.W.2d at 731. But no such evidence was presented. The insurers here simply relied on the argument that "damages" has an unambiguous technical meaning. While that may be true, it misses the point. Technical meaning is the exception rather than the rule in Missouri, and the insurers therefore also had to show that the parties intended to be bound by it. We thus disagree with the Eighth Circuit that the Missouri Supreme Court would not construe "damages" to carry the meaning a layperson would give to it.

We also reject the insurers' argument, adopted in *NEPACCO* (842 F.2d at 986), that the language of CERCLA is against

---

**7.** *See, e.g., New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162 (3d Cir.1991); *Avondale Industr., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1207 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Jones Truck Lines v. Transport Ins. Co.*, 29 Env't Rep.Cas. (BNA) 1606, 1613 (E.D.Pa. 1989); *Chesapeake Utils. Corp. v. American Home Assurance Co.*, 704 F.Supp. 551, 559–60 (D.Del.1989); *United States Fidelity & Guar. Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139, 1169–70 (W.D.Mich.1988); *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 662 F.Supp. 71, 75 (E.D.Mich. 1987); *Boeing Co. v. Aetna Casualty & Surety Co.*, 113 Wash.2d 869, 784 P.2d 507, 511–12 (1990).

**8.** *See, e.g., Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979, 981 (4th Cir.1989); *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348, 1352 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 98 L.Ed.2d 654 (1988); *Cedar Chemical Corp. v. American Universal Ins. Co.*, No. 87–2838–4B, mem. op. at 6 (W.D.Tenn. Sept. 13, 1989); *Hayes v. Maryland Casualty Co.*, 688 F.Supp. 1513, 1515 (N.D.Fla.1988); *Travelers Ins. Co. v. Ross Elec. of Washington, Inc.*, 685 F.Supp. 742, 745 (W.D.Wash.1988); *Lido Co. of New England v. Fireman's Fund Ins. Co.*, 574 A.2d 299, 301 (Me. 1990); *Braswell v. Faircloth*, 300 S.C. 338, 387 S.E.2d 707, 710–11 (1989).

construing the word "damages" to encompass liability for the governments' cleanup costs. It is of no consequence that CERCLA lists separately liability for "all costs of removal or remedial action incurred by the United States Government or a State" (42 U.S.C. § 9607(a)(4)(A)), and liability for "damages for injury to, destruction of, or loss of natural resources" (*id.* § 9607(a)(4)(C)). Other sections treat response costs as a subset of damages. CERCLA provides, for example, that the measure of "damages to natural resources" shall "not be limited to the sums which can be used to replace or restore such resources." 42 U.S.C. § 9607(f)(1). Moreover, courts that have interpreted CERCLA do not seem to distinguish governmental cleanup costs from "damages." The Supreme Court characterized section 107 as providing "liability in damages," and concluded that CERCLA "hold[s] States liable in damages in federal court." *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 12, 13, 109 S.Ct. 2273, 2280, 2281, 105 L.Ed.2d 1 (1989). Other courts have also identified CERCLA claims for relief as including cleanup costs "or other damages." *See, e.g., Cadillac Fairview/California v. Dow Chemical Co.*, 840 F.2d 691, 693 (9th Cir. 1988); *Gopher Oil Co. v. Union Oil Co. of California*, 757 F.Supp. 988, 997 (D.Minn. 1990); *Commerce Holding Co. v. Buckstone*, 749 F.Supp. 441, 443 (E.D.N.Y.1990); *Ogden Corp. v. The Travelers Indem. Co.*, 739 F.Supp. 796, 801 (S.D.N.Y.1989); *Philadelphia v. Stepan Chemical Co.*, 713 F.Supp. 1484, 1486 n. 3 (E.D.Pa.1989). We not only have done the same, but also have stated that restitutionary relief (cost of restoration) is a proper measure of recovery in "resource damages actions." *See Ohio v. U.S. Dep't of Interior*, 880 F.2d 432, 459 (D.C.Cir.1989).

The insurers also argue that to interpret "damages" to include cleanup costs would make no sense when the clause—"all sums which the insured shall become legally obligated to pay as damages"—is read as a whole. They believe such a reading must be incorrect because it would make the term "damages" all-inclusive; if cleanup costs are "damages," then so are "all

sums" a party might have to pay, such as fines, penalties, and attorneys' fees. The argument, in other words, is that the reference to "damages" would be rendered redundant because it would not limit or qualify the term "all sums."

We can see how an ordinary person might view response costs, but not fines or penalties, as "damages." Liability for environmental response costs is similar to compensation placing an individual in the position that he would have been in had the injurious action not occurred. This is how "damages" is ordinarily understood. A fine or penalty, in contrast, is not understood to be dollar-for-dollar recompense. Rather, it is a pecuniary form of punishment for the commission of an act society finds repugnant and seeks to deter. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 852, 1668 (1981); BLACK'S LAW DICTIONARY 632, 1133 (6th ed. 1990); *see also Gloucester Township v. Maryland Casualty Co.*, 668 F.Supp. 394, 401 (D.N.J.1987). In regard to attorneys' fees, Missouri law is against the insurers' position. A Missouri appeals court has held that attorneys' fees are "indistinguishable from a damages award for [insurance] coverage purposes" where the operative policy language is the same as in this case. *Hyatt Corp. v. Occidental Fire & Casualty Co. of North Carolina*, 801 S.W.2d 382, 393 (Mo.Ct.App. 1990).

■ We therefore hold that under the insurance policies governed by Missouri law, "damages" includes costs the insured is legally obligated to pay to the United States and Missouri as reimbursement for their activities in remedying environmental harm.

## II

■ The remaining question on appeal is whether an insurance policy issued by Pacific Indemnity Company covered Independent Petrochemical, Charter Oil and The Charter Company at the time Bliss sprayed the oil containing dioxin. Pacific Indemnity maintains that the policy expired on January 7, 1971, when Signal Oil and Gas

Company sold all of Independent Petrochemical's outstanding stock to Charter Oil Company, six weeks before Bliss first began removing the dioxin-contaminated material. The district court agreed that the policy expired and therefore granted Pacific's motion for summary judgment. We affirm.

As a preliminary matter, we must decide what law governs our interpretation of the Pacific policy, a question not addressed below. Pacific Indemnity maintains that California law governs. Pacific Indemnity is a California corporation, Pacific and Signal Oil have their principal places of business in California, Signal paid the premiums in California, and Pacific administered the policy there. On the other hand, Missouri law might govern because Missouri is where the insured risk is located. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 193 (1971). We need not choose between the two, however, because the laws of Missouri and California generally are compatible. *See Muller v. Massachusetts Mut. Life Ins. Co.*, 644 F.Supp. 916, 918 (D.D.C.1986). Like Missouri law, California law merely requires the terms of the Pacific policy to be construed according to their ordinary meaning. *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990); *Mill Valley v. Transamerica Ins. Co.*, 98 Cal.App.3d 595, 602, 159 Cal. Rptr. 635, 639 (Ct.App. 1st Dist.1979); *Highlands Ins. Co. v. Universal Underwriters Ins. Co.*, 92 Cal.App.3d 171, 174–75, 154 Cal.Rptr. 683, 685 (Ct.App. 2d Dist. 1979).

In relevant part, Item 1(A) of the policy defines "named insured" as "the subsidiary and associate companies of 'The Signal Companies' ... or other company but only as listed in Item 6 of the Declarations...." Item 6 is a listing of companies entitled "Schedule of Subsidiaries/Associates Insured." When read together, Item 1(A) and Item 6 express the parties' intention to insure companies that are in some way affiliated with Signal. Item 1(A) speaks of "subsidiary and associate companies," and refers to what is an "at-a-glance" reference list for identifying who those subsidiaries and associates might be. At the time of the stock transfer from Signal to Charter Oil, Independent Petrochemical lost its status as a subsidiary and therefore no longer fell within the ambit of the Pacific policy.

It is equally clear that continued coverage was not intended to be an automatic consequence of the stock transfer transaction. In Article XXI(a) of their Agreement and Plan of Reorganization, Signal agreed to maintain Independent Petrochemical's coverage "pending the Closing Date." Article XXI(b) provides that "[a]t Charter Oil's request" and "for a reimbursement by Charter Oil of a pro rata share of premiums paid by Signal," Signal would "use its best efforts to continue coverage ... after the Closing Date and until expiration of the policy year ... to the extent permitted by the particular Signal insurance policy." Charter took none of these steps. Instead, it obtained other insurance coverage for Independent Petrochemical effective October 3, 1970, months before the closing date.

\* \* \* \* \* \*

We affirm the district court's order of February 4, 1986, and its judgment, in favor of Pacific Indemnity "on all claims made by Plaintiffs in this action." For the reasons set forth in part I, we reverse the district court's judgment that the policies governed by Missouri law do not cover environmental cleanup costs, incurred by the state and federal governments, for which the insured is legally obligated.