AETNA CASUALTY AND SURETY CO., INC., a Connecticut corporation, Plaintiff–Appellee,

v.

PINTLAR CORPORATION, a Delaware corporation; Gulf Resources and Chemical Company, a Delaware corporation, Defendants–Appellants.

CONTINENTAL RE–INSURANCE CORP., a California corporation; Pacific Insurance Company, a California corporation; Fidelity & Casualty Co. of New York, a New York corporation, Plaintiffs–Appellees,

v.

PINTLAR CORPORATION, a Delaware corporation; Gulf Resources and Chemical Company, a Delaware corporation, Defendants–Appellants.

Nos. 89–35286, 89–35287.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1990.

Submission Vacated June 5, 1990.

Resubmitted Oct. 31, 1991.

Decided Nov. 7, 1991.

As Amended Dec. 30, 1991.

---

Stephen W. Greiner, Richard Mancino, Melissa A. Robertson, Willkie Farr & Gallagher, New York City, Fred M. Gibler, Charles L.A. Cox, Evans, Keane, Koontz, Boyd, Simko & Ripley, Kellogg, Idaho, for defendants-appellants.

R.B. Kading, Jr., Warren E. Jones, Scott D. Hess, Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, Idaho, for plaintiff-appellee Aetna Cas. & Sur. Co.

Robert T. Wetherell, Quane, Smith, Howard & Hull, Boise, Idaho, for the plaintiffs-appellees Continental Re-Insurance Corp. Pacific Ins. Co. and Fidelity & Cas. Co. of New York.

Before WRIGHT, POOLE and BRUNETTI, Circuit Judges.

POOLE, Circuit Judge:

Gulf Resources & Chemical Corporation and its subsidiary Pintlar Corporation (collectively, Gulf) appeal the district court's grant of summary judgment absolving Aetna Casualty and Surety Company and Aetna Life Casualty Company (collectively, Aetna) and Continental Re-Insurance Corporation, Pacific Insurance Company, and Fidelity & Casualty Company of New York (collectively, Continental) from their duty to defend and indemnify Gulf in connection with Gulf's potential liability for environmental contamination. 709 F.Supp. 958.

I

Facts and Procedural History

In October 1984, the Environmental Protection Agency (EPA) notified Gulf that it was deemed to be a potentially responsible party (PRP) in connection with the contamination of a twenty-one square mile area of northern Idaho known as the Bunker Hill Site. Gulf, its predecessors, or subsidiaries had owned and operated mining and smelting facilities at the Bunker Hill Site from approximately 1885 until 1982.

EPA did not immediately institute a civil action against Gulf. Instead, it pursued administrative remedies. In 1986, EPA initiated "Fast Track" removal actions at the Bunker Hill Site. The cost of these actions totaled $962,500.

In August 1986, EPA and Gulf commenced negotiations concerning Gulf's participation in a remedial investigation and feasibility study ("RI/FS") of the Bunker Hill Site. At that stage, should the PRP refuse to perform the RI/FS, EPA could order it to do so or perform the study itself and then sue for reimbursement.

In May 1987, in connection with an EPA administrative consent order, Gulf agreed to perform and pay for a RI/FS of the non-populated areas of the Site. Under 42 U.S.C. § 9606(a), the government is authorized to "secure such relief as may be

necessary to abate such danger or threat" and the district court to "grant such relief as the public interest and the equities of the case may require." 42 U.S.C. § 9606(a).

After discovering it was a PRP and following negotiations with the EPA, Gulf turned to its insurers for defense and indemnity costs in connection with the EPA's claims. The insurers in turn brought declaratory judgment actions seeking relief from any liability. The district court granted the insurers' motions for summary judgment, finding that as a matter of law the comprehensive general liability (CGL) policies could not be interpreted to provide coverage for CERCLA-related claims.

Aetna had issued Gulf the policies for policy periods beginning November 1, 1967 and extending to April 15, 1972. Continental issued Gulf seven policies of insurance for the January 1, 1972 to April 15, 1978 time period. The terms of the policies are not disputed. Aetna's policies provide:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies ... caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such ... property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient....

The policies define "occurrence" as follows:

"Occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither

expected nor intended from the standpoint of the insured.

"Policy period" is defined as follows:

IV. Policy Period; Territory.

This insurance applies only to bodily injury or property damage which occurs during the policy period within the policy territory.

The policies define "damages" as:

damages for death and for care and loss of services resulting from bodily injury and damages for loss of use of property resulting from property damage.....]

The policies exclude coverage for, *inter alia:*

property damage to ... property owned or occupied by or rented to the insured.

Continental's policies contain similar language.

The district court granted the insurers' motions for summary judgment on four grounds. First, it held that there was no duty to defend. The court found that the policies specifically state that the duty to defend is triggered by a "suit" and a complaint had not yet been filed in this case.

Second, the district court held that response costs [1] are equitable relief and as such are not payments to third parties "as damages." Third, the court held that even if response costs are equitable in nature, they are not sums payable "because of ... property damage" since under 42 U.S.C. § 9607(a)(4)(A) liability for response costs may be imposed without a finding of property damage.

Fourth, relying on *Idaho v. Bunker Hill Co.,* 647 F.Supp. 1064 (D.Idaho 1986) (Ryan, J.) ("Bunker Hill II"), Judge Ryan in the instant case held that there is no coverage for natural resource damage claims [2] under the policies in question. *Bunker Hill II* had held that the state cannot recover for "natural resource dam-

---

1. 42 U.S.C. § 9607(a)(4)(A) states, *inter alia,* that any person who owned or operated any facility from which hazardous wastes were disposed shall be liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan...." 42 U.S.C. § 9607(a)(4)(A).

2. 42 U.S.C. § 9607(a)(4)(C) states that any person who owned or operated any facility from which hazardous wastes were disposed shall be liable for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release...." 42 U.S.C. § 9607(a)(4)(C).

age" occurring prior to December 11, 1980 because the policies provide coverage only when the release of the hazardous substance and "property damage" both occur during the policy period. *Idaho v. Bunker Hill Co.*, 647 F.Supp. 1064, 1069–70 (D.Idaho 1986).

This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The appeal was timely filed. We reverse.

## II

### Standard of Review

■ This court reviews *de novo* a grant of summary judgment. *Kruso v. International Telephone and Telegraph Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied* — U.S. —, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Viewing the evidence in the light most favorable to the nonmoving party, we inquire whether there exist genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Fu–Kong Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

■ We also review *de novo* principles of contract interpretation applied to the facts, including whether contract language is ambiguous. *L.K. Comstock & Co. v. United Engineers and Constructors, Inc.*, 880 F.2d 219, 221 (9th Cir.1989).

## III

### Discussion

Appellants raise four issues on appeal: (1) whether response costs under 42 U.S.C. § 9607(a)(4)(A) are considered "damages" under the CGL policies; (2) whether the response costs are sums sought "because of ... property damage" as that phrase is used in the insurance contracts; (3) whether the CGL policies provide coverage for claims the United States may assert against the insureds for natural resource damages; and (4) whether EPA's administrative claims against the insureds trigger the insurers' duty to defend under the CGL policies. We will deal with these issues *seriatim.*

1. *Whether response costs under 42 U.S.C. § 9607(a)(4)(A) are covered as "damages" under the CGL policies in question*

The policies state that "[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence....". According to the policies, an occurrence exists if there is an accident which includes injurious exposure to conditions and which causes property damage during the policy period which is neither expected nor intended by the insured.

■ Thus, we must determine the nature of response costs; the question presented is whether response costs are "sums which the insured shall become legally obligated to pay as damages." Insurers contend that when the government seeks cleanup costs it is really seeking restitution and/or mandatory injunctive relief, and therefore coverage is not available. Insureds answer that response costs *are* "damages" from the perspective of an ordinary person and thus are covered.

Courts are by no means uniform in the resolution of this dispute. Three United States circuit courts that have addressed the issue under the laws of four different states have held that response costs are not covered damages under the CGL policies. *See, e.g., A. Johnson & Co. v. Aetna Casualty & Surety Co.*, 933 F.2d 66, 69 (1st Cir.1991) (noting in dicta that under Maine law, administrative or cleanup costs are not "damages" within the meaning of a CGL policy); *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977, 985 (8th Cir.1988) (en banc) (5–3 vote) (under Missouri law, the term "damages" is ambiguous outside the insurance context; however, in the insurance realm, the plain meaning of the term does not include equitable monetary relief) *cert. denied* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) ("*NEPACCO* "); *Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979, 981 (4th Cir.1988) (under Maryland law, the

word "damages" is *not* ambiguous in the insurance context, and it means "legal damages"); *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348, 1352 (4th Cir. 1987) ("*Armco*") (under Maryland law, the term "damages" should be afforded its technical meaning which does not include claims for injunctive or restitutionary relief), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).[3]

In contrast, the Second, Third, Ninth and the District of Columbia Circuits, construing state law, as well as various other courts, including the California Supreme Court, have held that response costs are "damages" covered under the CGL policies.[4] Within the district of Idaho, two judges on the same court have come to opposite conclusions. The district judge in this case had previously held that response costs are not compensable under CGL policies. *Aetna Casualty & Surety Co. v. Gulf Resources and Chem. Corp.*, 709 F.Supp. 958, 962 (D.Idaho 1989) (Ryan, J.). Judge Callister in *Unigard Mutual Ins. Co. v. McCarty's, Inc.*, No. 83–1441 (D.Idaho Aug. 4, 1989) held that the ordinary meaning of "damages" encompassed response costs. The debate focuses on the different views of judges and parties as to the plain and ordinary meaning of the term "as damages." *Unigard Mutual Ins. Co. v. McCarty's Inc.*, No. 83–1441, slip op. at 8 (D.Idaho Aug. 4, 1989).

■ The terms of an insurance contract dictate the obligations of the parties. Clear and unambiguous terms in insurance policies are construed according to their plain meaning, that is, what an ordinary reasonable lay person would interpret the meaning to be.[5] *Mutual of Enumclaw v.*

---

3. *Armco* and *NEPACCO* are not persuasive authority under Idaho law as they explicitly reject the ordinary person's view of the term "damages." *Armco*, 822 F.2d at 1352; *NEPACCO*, 842 F.2d at 981. *Milliken* merely adopts *Armco's* and *NEPACCO'S* reasoning without any analysis of its own. *Milliken*, 857 F.2d at 981.

4. *See, e.g., Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 944 F.2d 940 at 947 (D.C.Cir.1991) (holding that under Missouri law, the term "damages" as used in insurance policies includes response costs); *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162, 1188 (3d Cir.1991) (holding that under Delaware law, "'damages' ... in the context of a standard CGL policy ... should be interpreted ... to encompass response costs...."); *Avondale Indus. Inc. v. Travelers Indemnity Co.*, 887 F.2d 1200, 1207 (2d Cir.1989) (under New York law, cleanup costs come within CGL coverage as "damages"), *cert. denied* — U.S. —, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1194 (9th Cir.1986) (under Oregon law, cleanup costs are recoverable under a property damage liability clause); *Chesapeake Utilities Corp. v. American Home Assurance Co.*, 704 F.Supp. 551, 561 (D.Del.1989) (under Maryland law, the term "damages" does not, as a matter of law, exclude cleanup costs); *Intel Corp. v. Hartford Accident & Indemnity Co.*, 692 F.Supp. 1171, 1193 (N.D.Cal.1988) (under California law, cleanup costs are damages under a CGL policy), *appeal pending* No. 89–15165 (9th Cir. 1989); *United States Fidelity & Guar. Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139, 1168 (W.D.Mich.1988) (applying Illinois law and holding that "while ... claims for [cleanup costs] might be characterized as seeking 'eq-

uitable relief', ... cleanup costs are essentially compensatory damages for injury to common property and for that reason the insurer has a duty to defend."), *vacated on other grounds*, 683 F.Supp. at 1174 (W.D.Mich.1988); *Fireman's Fund Insurance Companies v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 75 (E.D.Mich.1987) (" '[D]amages' include money spent to clean up environmental contamination."); *AIU Ins. Co. v. Superior Court (FMC Corp.)*, 51 Cal.3d 807, 274 Cal. Rptr. 820, 842–45, 799 P.2d 1253, 1275–78 (Cal. 1990) (holding that under California law, insurers are obligated to provide coverage for cleanup and other "response costs" incurred under CERCLA); *The Boeing Company v. Aetna Casualty and Surety Co.*, 113 Wash.2d 869, 784 P.2d 507, 516 (1990) (en banc) (holding that response costs are "damages" under the CGL clause at issue).

5. Although Judge Ryan and Judge Callister apparently agree on the plain meaning standard, the insurers seem to take issue: they urge us to adopt the "settled legal meaning" rule. We decline, concluding that the plain meaning standard appears to be applicable in Idaho. *See, e.g., Kromrei v. Aid Insurance Co.*, 110 Idaho 549, 716 P.2d 1321, 1323 (1986) ("[W]here the policy language is clear and unambiguous, there is no occasion for construction and coverage must be determined according to the plain meaning of the words employed."). As the District of Columbia Circuit noted in *Independent Petrochemical Corp.*, in nearly all cases in which the state's rules of insurance contract interpretation require such contracts to be construed within the common usage of terms, the term "damages" has been construed to include response costs. *Independent Petrochemical Corp.* 944 F.2d at 946 (citations omitted).

*Harvey*, 115 Idaho 1009, 772 P.2d 216, 220 (1989); *see also AIU Ins. Co.*, 51 Cal.3d 807, 274 Cal.Rptr. at 831–32, 799 P.2d at 1264–65; *Kromrei v. Aid Insurance Co.*, 716 P.2d 1321, 1323 (Idaho 1986); *Thomas v. Farm Bureau Mutual Ins. Co.*, 82 Idaho 314, 353 P.2d 776, 778 (1960). To the point is *Shields v. Hiram C. Gardner, Inc.*, 92 Idaho 423, 444 P.2d 38, 42 (1968) ("[C]ontracts of insurance are to be construed in view of their general objects and strict, technical interpretation is to be avoided."). When the language of the contract has a single plain interpretation, that language will determine the parties' obligations.

Dictionary definitions indicate that in the lexicon of the ordinary person, the plain meaning of the term "damages" would include response costs.[6] This is so because the term "damages", in common thought, does not distinguish between equitable and nonequitable relief. "Any definition of 'damages' which is grounded upon the ancient division between law and equity—such as the definition now proffered by the insurers—would hardly be an 'ordinary and accepted meaning' in the eyes of a 'reasonably prudent layperson.'" *Chesapeake Utilities Corp. v. American Home Assurance Co.*, 704 F.Supp. at 560 (citation omitted); *cf. Mutual of Enumclaw v. Harvey*, 772 P.2d at 220. (" 'Though the word 'costs' as a legal term of art may be ambiguous, it is not so from the perspective of the ordinary person unfamiliar with the jargon of the legal and insurance professions standing in the position of the insured. An insurance policy must be interpreted from that perspective.' " (citation omitted)).

A technical, arcane approach in discerning the meaning of damages under the policies must not be taken. The plain meaning of "damages" from the perspective of an ordinary person would include CERCLA response costs. As Judge Callister said:

Under this ordinary definition of "damages", [*Webster's Third New International Dictionary* at 571 (1971)] court-mandated clean-up costs would stand on the same footing with, say, a court-award of compensation for a specific loss: both involve 'compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right.'

*Unigard*, slip op. at 5.

■ Even if the term "as damages" is ambiguous, the insureds would still be liable. Under Idaho law, "[w]here language may be given two meanings, one of which permits recovery and the other does not, it is to be given the construction most favorable to the insured." *Erikson v. Nationwide Mut. Ins. Co.*, 97 Idaho 288, 543 P.2d 841, 845 (1975); *accord Shields v. Hiram C. Gardner, Inc.*, 444 P.2d at 42; *Bunker Hill II*, 647 F.Supp. at 1072–73. If an insurer intends the term "damages" to be construed in a legal technical way, it should indicate that in the policy:

The plaintiff insurers could have limited the definition of damages to mean something less than the ordinary definition by simply including a sentence in the policy that damages do not include equitable relief. But the drafters failed to limit the term, and the Court cannot now ride to the rescue.

*Unigard*, slip op. at 5.

The term "as damages" as used in the insurance policies must logically be held to include response or cleanup costs assessed under 42 U.S.C. § 9607(a)(4)(A), and even if the term is ambiguous, response costs are still covered damages because the insurer failed to include a specific, legalistic definition of damages in the policy.

2. *Whether CERCLA response costs sums are payable "because of property damage" as that term is used in the insurance policies*

The policies state that the insurers "will pay on behalf of the insured all sums which

---

**6.** Typically, the term "damages" is defined broadly. *See Webster's Third New International Dictionary* at 571 (1971) (defining damages as "the estimated reparation in money for detriment or injury sustained"). *See also The Random House College Dictionary* at 336 (Rev. ed. 1980) (defining damages as "the estimated money equivalent for detriment or injury sustained").

the insured shall become legally obligated to pay as damages because of ... property damage." Property damage is defined as "injury to or destruction of tangible property."

While the district court found persuasive insurers' argument that response costs are not damages, it stated there was a "more basic" reason for denying coverage to the insureds. Relying on *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325 (4th Cir.1986), the court held that because there is no requirement of proof of property damage in order for response cost liability to exist, such costs could not be said to "result from property damage", and therefore were not covered under the CGL policies. We disagree.

The insurers concede that environmental contamination constitutes property damage. The sums the insureds are legally obligated to pay the EPA are because of that contamination. Under the policies the insurers must pay "all sums which insured shall become legally obligated to pay as damages because of ... property damage...."

The contamination included an area of property owned and operated by the insured. The insurers argue that the policies specifically exclude coverage for property damage to property owned or occupied by the insured. They further argue that the government seeks response costs to recover or replenish the Super Fund rather than for physical injury to or destruction of tangible property. Both arguments fail, however. In addition to the loss to the actual owners of the contaminated land, the government also sustained "property damage" to its quasi-sovereign interest in environmental resources. *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*, 811 F.2d 1180, 1184–85 (8th Cir.1987) (environmental contamination caused by improper disposal of hazardous wastes can constitute "property damage") *aff'd in part and rev'd in part on other*

*grounds*, 842 F.2d 977, 983 (8th Cir.1988) (en banc), *cert. denied* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).

Further, insurers argue that response costs claims merely seek to recover "economic loss"; *citing Mraz*, 804 F.2d at 1329, they contend that this does not constitute property damage and therefore is not covered. However, the only court adopting the economic loss theory is *Mraz*, and it cites no supporting authority. Most courts that have dealt with the issue have criticized the economic loss theory and rejected it. *See Intel Corp. v. Hartford Accident & Indem. Co.*, 692 F.Supp. at 1187; *New Castle County v. Hartford Accident & Indem. Co.*, 673 F.Supp. at 1366.

The district court, persuaded by *Mraz*, interpreted the policies in a way which rejected their plain meaning. *Mraz*, in applying Maryland law, embraced a technical and legal interpretation of contract terms.[7] Idaho has rejected that construction in favor of a "plain meaning" analysis. *See Mutual of Enumclaw v. Harvey*, 772 P.2d at 220.

The district court recognized that there had been releases of hazardous substances, which the EPA claims Gulf and its predecessors released, and that these releases "impacted" the Bunker Hill Site. The insurers further concede that contamination of the soil and water by hazardous substances constitutes injury to property and natural resources. *See Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d at 1194 ("[D]ischarge of pollution into water causes damage to tangible property and hence cleanup costs are recoverable under a property damage liability clause."). An ordinary person would find that the environmental contamination alleged by the EPA falls within the plain meaning of "property damage" as that term is used in the policies.

Nor are we swayed by insurers' arguments that response costs are akin to purely preventative safety measures. Re-

---

7. Some courts take issue with *Mraz's* application of Maryland law. *See Intel Corp. v. Hartford Accident & Indemnity Co.*, 692 F.Supp. at 1186–87 (no reference to Maryland law in *Mraz* opin-

ion); *Chesapeake Utilities Corp. v. American Home Assurance*, 704 F.Supp. at 566 n. 35 (expressly rejecting *Mraz* as failing to apply Maryland law).

sponse costs in this case are remedial. They are incurred as a result of responding to contamination; they are not simply a government-imposed cost of doing business for firms which release hazardous substances. They are not imposed to prevent property damage, rather, they are imposed "because of ... property damage." *See Aerojet–General Corp. v. Superior Court of San Mateo County (Chesire and Companies)*, 211 Cal.App.3d 216, 234, 257 Cal. Rptr. 621, 258 Cal.Rptr. 684 (1st Dist.1989) ("[P]rophylactic costs are not incurred 'because of injury to, or loss, destruction or loss of use of property'....").

Moreover, from a policy perspective, it makes little sense to say that to the extent the environment can be cleaned up cost does not fall within the policies, but that the policies do cover the damage left after the cleanup process is complete. Such an analysis would invite pollution at levels that would be impossible to clean up, since the insurers could be held liable for the natural resource damages. In the instant case, we think cleanup costs constitute damages incurred "because of ... property damage" as that term is used in the policies.

3. *Whether the CGL policies provide coverage for claims the United States may assert against the insureds for natural resource damages*

The district court held that while the CGL policies would normally cover natural resource damage, they do not in this case because "liability is barred by issues of timing." *Aetna Casualty & Surety Co. v. Gulf Resources and Chem. Corp.*, 709 F.Supp. 958, 962 (D.Idaho 1989). Relying on its opinion in *Idaho v. Bunker Hill Co.*, 647 F.Supp. 1064 (D.Idaho 1986) ("Bunker Hill II"), the court ruled that "damages under 42 U.S.C. § 9607(a)(4)(C) cannot be recovered for damage occurring prior to the enactment of CERCLA in 1980." *Id.* The court also held that the policies "only provide coverage when the property damage for which damages are sought and the cause of that damage both occurred during the policy period." *Id.*

With respect to natural resource damage claims, as opposed to response costs, 42 U.S.C. § 9607(f)(1) provides:

There shall be no recovery under the authority of subparagraph (C) of subsection (a) of this section where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980.

"Damages" are defined under CERCLA as "damages for injury or loss of natural resources...." 42 U.S.C. § 9601(6). The district court did not define the terms "damage" and "damages" in its opinion. It appears to have equated the term "damages" in 42 U.S.C. § 9607(f)(1) with injury to the natural resources. The statutory definition, although somewhat circular, does not support this interpretation. Rather, the statute appears to define "damages" as "the monetary quantification stemming from an injury." *See In Re Acushnet River & New Bedford Harbor Proceedings*, 716 F.Supp. 676, 681 (D.Mass. 1989).

If the above definition of the term "damages" is accepted, then it is quite possible that such damages were incurred after December 11, 1980. Such damages could have been caused by releases and injury occurring during the policy period. Thus, it is conceivable that there is coverage for natural resource damage claims. As a result, the district court's summary judgment ruling was at least premature.

Moreover, if exposure to hazardous conditions results in injury during the policy period, which in turn causes additional injury after the policy period, the policy would cover the additional damage. For instance, if releases caused injury to soil and water during 1971 and that pollution later injured migratory birds, the later injury to the birds would be covered.

Insurers read the term "damages" in 42 U.S.C. § 9607(f)(1) to mean "injury." The insurers contend that the EPA cannot, as a matter of law, bring a claim for natural resource damages against Gulf for any injury which occurred during the insureds' policies of insurance.

■ Insurers argue that the release, injury and damages must all occur during the policy period in order for coverage to be afforded. These policies, however, are occurrence based. They require that there be an "accident including injurious exposure to conditions which results, during the policy period, in ... property damage neither expected nor intended from the standpoint of the insured." There is no indication in the policies that the monetary quantification stemming from the injury must also occur during the policy period. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 2926 n. 3, 57 L.Ed.2d 932 (1978) ("An 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy.")

A genuine issue of material fact exists as to whether the policies provide coverage for natural resource damage claims made by the government after December 11, 1980. Further, coverage is not limited to "damages" occurring during the policy period; it also includes "damages" occurring after the period, as long as those "damages" are caused by an "occurrence", that is, a release which results in injury during the policy period.

4. *Whether EPA's administrative claims against the insureds trigger the insurers' duty to defend under the CGL policies*

The policies state:

[T]he company shall have the right and duty to defend any suit against the insured seeking damages on account of ... property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient

. . . .

Relying on its decision in *Bunker Hill II*, the district court held that the duty to defend is triggered by the filing of a complaint and because a complaint had not been filed in this case the duty to defend has not been triggered.[8] *Aetna Casualty & Surety Co. v. Gulf Resources and Chem. Corp.*, 709 F.Supp. at 960.

■ Under Idaho's "plain meaning" doctrine of insurance policy construction, a court looks to the plain meaning of the policy language. The district court held that the policies at issue state that the company has a duty to defend a " 'suit'— not 'claim,' not 'administrative proceeding,' but suit." *Aetna*, 709 F.Supp. at 960.

Insureds argue that the term "suit" is not defined in the policies and that nothing in the policies supports the conclusion that "suit" is limited to the filing of a complaint in a civil action. They argue that an ordinary PRP would view a PRP notice as triggering the need to defend itself and as thus instituting a "suit." *See Avondale Industries, Inc. v. Travelers Indem. Co.*, 887 F.2d at 1206 ("suit" as used in the policy applies to administrative proceedings); *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 662 F.Supp. at 75 ("[A] 'suit' includes any effort to impose on policyholders a liability ultimately enforceable by a court....")

Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds' rights. However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process. *Avondale Industries, Inc. v. Travelers Indem. Co.*, 697 F.Supp. 1314, 1321 (S.D.N.Y.1988) ("Ad-

---

**8.** Since the appeal was filed in this case, Gulf and EPA have entered into a settlement agreement concerning EPA's claim for damages for the 1986 removal actions. In connection with the agreement a civil action complaint was filed in district court concurrently with the filing of the negotiated settlement. While the filing of that complaint may impact the duty to defend after the filing of the complaint, we write to address the costs incurred before that time period.

verse consequences can befall an insured during the administrative pollution cleanup process."), *aff'd*, 887 F.2d 1200 (2d Cir. 1989).

The extent of CERCLA liability is far-reaching. The ability to choose the response action greatly empowers the government. In order to influence the nature and costs of the environmental studies and cleanup measures, the PRP must get involved from the outset. In many instances, it is more prudent for the PRP to undertake the environmental studies and cleanup measures itself than to await the EPA's subsequent suit in a cost recovery action.

There are many incentives to cooperate with the EPA. For instance, pursuant to 42 U.S.C. § 9607(c)(3), if a person who is liable for a release or threat of release of a hazardous substance fails to "properly provide removal or remedial action upon order of the President, pursuant to section 9604 or 9606 of this title," the EPA can choose to proceed with a Superfund-financed cleanup, and then seek punitive damages. Lack of cooperation may expose the insured, and potentially its insurers, to much greater liability, including the EPA's litigation costs.

As a result, an "ordinary person" would believe that the receipt of a PRP notice is the effective commencement of a "suit" necessitating a legal defense. The PRP letter forced Gulf to hire technical experts and lawyers to protect its interests in connection with EPA's actions. Moreover, if the receipt of a PRP notice is held not to trigger the duty to defend under CGL policies, then insureds might be inhibited from cooperation with the EPA in order to invite the filing of a formal complaint.

In contrast, insurers argue that no "suit" can be instituted against the insured without an actual lawsuit being filed. They point to the language of the policies to prove that a distinction is made between the mandatory duty to defend "suits" and nonmandatory right to investigate "claims." Insurers claim their argument is supported by *Kootenai County v. Western Casualty & Surety*, 113 Idaho 908, 750 P.2d 87 (1988). In dicta in *Kootenai*, the Idaho Supreme Court, citing Judge Ryan's decision in *Bunker Hill II*, held that "'[t]he duty to defend arises upon the filing of a complaint whose allegations, in whole or part, read broadly, reveal a potential for liability that would be covered by the insured's policy.'" *Kootenai* 750 P.2d at 90, *quoting Idaho v. Bunker Hill Co.*, 647 F.Supp. at 1068. However, in *Kootenai* the issue whether the duty to defend can arise only upon the filing of a complaint was not before the court. Instead, the court held that the insurer was put on notice of its duty to defend after it received notice of a complaint filed against the insured alleging negligent acts within the policy coverage. *Kootenai*, 750 P.2d at 93.

Insurers attack insureds' arguments by stating that no Idaho rule of construction obligates a court to interpret a policy so that settlement of litigation may be fostered. Moreover, they point out that if insureds' analysis is adopted, either insurers would have to defend all claims or courts would be called upon to determine whether a demand was a claim or a suit. The effect, they say, would be to obviate years of insurance law and cloud the bright line test that holds an insurer liable only when a complaint has been filed.

We hold that the EPA's administrative claims against the insureds triggered insurers' duty to defend. Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation. A fundamental goal of CERCLA is to encourage and facilitate voluntary settlements. *Interim Guidance on Notice Letters, Negotiations, and Information Exchange*, EPA Memorandum, 53 Fed.Reg. 5298 (1988). It is in the nation's best interests to have hazardous waste cleaned up effectively and efficiently. But the insured is not required to submit to, and may in fact wish to oppose the threat. In either event, the insurer's duty to defend may well be triggered.

Further, we do not agree with insurers' complaints of obliteration of a bright-line test. The rationale behind defending insureds when a complaint has been filed is that, traditionally, that is when the jeopar-

dy to the insureds' rights can be adversely affected. The focus should be on the underlying rationale and not on the formalistic rituals. If the threat is clear then coverage should be provided. The filing of an administrative claim is a clear signal that legal action is at hand.

## IV

### Conclusion

The district court erred in granting insurers' motions for summary judgment. Response costs are considered "damages" under the CGL policies and are sums sought "because of ... property damage" as that term is used in those policies. At least, a genuine issue of material fact exists as to whether and to what extent the United States may assert a claim for natural resource damages against the insureds. Finally, EPA's administrative claims against the insureds trigger insurers' duty to defend under the CGL policies.

We reverse the district court's grant of summary judgment and remand this case to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.