UNITED STATES of America, Plaintiff,

v.

PEPPER'S STEEL AND ALLOYS, INC.; Florida Power & Light Company; Norton Bloom; Thomas A. Curtis; William Payne; Flora Payne; and Lowell Payne, Defendants.

PEPPER'S STEEL AND ALLOYS, INC.; and Norton Bloom, Cross–Plaintiffs,

v.

FLORIDA POWER & LIGHT COMPANY, Cross–Defendant.

Thomas A. CURTIS; William Payne; Flora Payne; and Lowell Payne, Cross–Plaintiffs,

v.

FLORIDA POWER & LIGHT COMPANY; and Pepper's Steel & Alloys, Inc., Cross–Defendants.

FLORIDA POWER & LIGHT COMPANY, Cross–Plaintiff and Third–Party Plaintiff,

v.

PEPPER'S STEEL AND ALLOYS, INC.; Norton Bloom; Thomas A. Curtis; William Payne; Flora Payne; and Lowell Payne, Cross–Defendants,

and

United States Fidelity and Guaranty Company; Transportation Insurance Company; Continental Casualty Company; The Home Insurance Company; Certain Underwriters at Lloyd's, London and Insurance Companies Subscribing To Twenty–Two Policies Numbered Inclusively L116–18, L1024–27, L1209–12, C116–18, C1024–27, and C1209–12; and Miami Battery Manufacturing Company, Third–Party Defendants.

MIAMI BATTERY MANUFACTURING COMPANY, Cross–Plaintiff and Third–Party Plaintiff,

v.

PEPPER'S STEEL AND ALLOYS, INC., Cross–Defendant,

and

Florida Power & Light Company, Third–Party Defendant.

PEPPER'S STEEL AND ALLOYS, INC.; and Norton Bloom, Plaintiffs,

v.

UNITED STATES FIDELITY AND GUARANTY COMPANY; Transportation Insurance Company; Continental Casualty Company; and the Home Insurance Company, Defendants.

Nos. 85–0571–CIV, 86–1531–CIV.

United States District Court, S.D. Florida.

June 7, 1993.

See also 132 F.R.D. 695.

Lawrence W. Puckett, Environmental Enforcement Section Land & Natural Resources Div., U.S. Dept. of Justice, Washington, DC.

Robyn Herman, Asst. U.S. Atty., S.D. Fl., Miami, FL.

Reuben Bussey, Office of Regional Counsel, U.S. E.P.A., Atlanta, GA.

Michael Northridge, Office of Enforcement and Compliance Monitoring (LE–134S) U.S. E.P.A., Washington, DC.

John W. Wilcox, Akerman, Senterfitt & Eidson, P.A., Tampa, FL, for Paynes and Curtis.

Kathleen A. Touby, Touby Smith DeMahy & Drake, P.A., Miami, FL, for Miami Battery.

David B. Weinberg, Weinberg, Bergeson & Neuman, Washington, DC.

Richard C. Smith, Coll, Davidson, Carter, Smith, Salter & Barkett, P.A., Miami, FL, for FPL.

Jack Chisolm, Deputy Gen. Counsel, Tallahassee, FL.

Elizabeth Nelson, Mendes & Mount, New York City.

Kevin P. O'Connor, O'Connor & Lemos, Coral Gables, FL, for London Market Insurers.

Landon K. Clayman, Baker & McKenzie, Miami, FL, for Home.

Richard L. Wassenberg, Ponzoli & Wassenberg, P.A., Miami, FL, for USF & G.

Stanley V. Buky, George, Hartz & Lundeen, P.A., Fort Lauderdale, FL, for CNA.

Christa L. Collins, Robert J. Wahl, Susan Bingham, Blasingame, Forizs & Smiljanich, P.A., St. Petersburg, FL, Co–Counsel for CNA.

John M. Murray, Thornton, David & Murray, P.A., Miami, FL, for Home.

William Martin, Peterson & Bernard, Fort Lauderdale, FL, Co–Counsel for Pepper's and Bloom.

Dennis A. Tosh, Walter J. Andrews, Wiley, Rein & Fielding, Washington, DC, for USF & G.

Keith, Mack, Lewis, Cohen & Lumpkin, Miami, FL, for Pepper's and Bloom.

## *OMNIBUS ORDER*

PAINE, District Judge.

This matter comes before the court on UNITED STATES FIDELITY AND GUARANTY COMPANY ("USF & G"), TRANSPORTATION INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY (collectively "CNA"), and THE HOME INSURANCE COMPANY's ("Home") Motions for Partial Summary Judgment (DE 275 in Case No. 86–1531–CIV–PAINE; DE 409),[1] and FLORIDA POWER & LIGHT COMPANY's ("FP & L") Cross–Motion for Partial Summary Judgment as to the Effect of the Use of the Term "Damages" (DE 877).[2] Having reviewed the record, the memoranda of counsel and relevant authorities, the court enters the following order.

## I. BACKGROUND [3]

From approximately 1967 to 1981, Pepper's Steel operated a scrap metal recovery business in Medley, Florida. In the late 1960s, Pepper's Steel expanded its business to include reclamation of electrical transformers from FP & L. The transformers were transported to the Pepper's Steel site,[4] and the salvageable metals from within the transformers were removed. The transformers frequently contained oil that was contaminated with polychlorinated biphenyls ("PCBs"), a hazardous substance under the Comprehensive Environmental Response and Compensation Liability Act of 1980, ("CERCLA"), 42 U.S.C. § 9601 *et seq.* In opening the transformers, the some of the PCB laden oil was discharged directly onto the surface of the ground at the Pepper's Steel site.

On July, 11, 1983, the UNITED STATES OF AMERICA ("United States"), at the request of the Environmental Protection Agency ("EPA"), brought a civil action against Pepper's Steel, NORTON BLOOM, WILLIAM U. PAYNE, FLORA B. PAYNE, LOWELL E. PAYNE, and THOMAS A. CURTIS ("the landowners"), seeking, *inter alia,* injunctive relief to gain access to the Pepper's Steel site to undertake response and remedial actions (Case No. 83–1717).[5] FP & L subsequently was joined as a defendant in the government's action because of its potential liability under CERCLA. On March, 5, 1985, the United States brought a second action against Pepper's Steel, FP & L, and the landowners, pursuant to Section 107 of CERCLA,[6] seeking to recover costs incurred by the EPA for the removal of PCBs from the Pepper's Steel site, an amount in excess of $400,000 (Case No. 85–0571). By order dated March 22, 1985, the court consolidated the 83–1717 case with the 85–0571 case.

On July 15, 1986, Pepper's Steel and Bloom filed a Complaint for Declaratory Relief and Damages, seeking a determination of the duties and obligations of USF & G, CNA, and Home under the insurance policies issued by them (Case No. 86–1531). The court denied the request to consolidate the 85–0571

---

1. Unless otherwise noted, the docket entries in this order refer to pleadings in Case No. 85–0571–CIV–PAINE.

2. PEPPER'S STEEL AND ALLOYS, INC. ("Pepper's Steel") and NORTON BLOOM ("Bloom") have joined FP & L in this motion (DE 932).

3. This section briefly summarizes the background of this case relevant to the instant motion. For additional history of this case, see *Payne v. United States Fidelity & Guar. Co.,* 625 F.Supp. 1189 (S.D.Fla.1985); *United States v. Pepper's Steel and Alloys, Inc.,* 658 F.Supp. 1160 (S.D.Fla.1987); *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co.,* 668 F.Supp. 1541 (S.D.Fla.1987).

4. The Pepper's Steel site, located in Medley, Florida, is bounded by 109th Street, the Miami Canal, 115th Street and the Florida East Coast Railway. The site and surrounding area is underlain by the Biscayne Aquifer, the primary source of drinking water for Southeast Florida.

5. In 1983, a civil action was filed by the State of Florida Department of Environmental Regulation ("Florida DER") against Pepper's Steel, FP & L, and the landowners in the Circuit Court of Dade County, Florida (Case No. 83–24667–08). The Florida DER complaint alleges that the release of PCBs caused damage to the environment and resulted in response costs.

6. Under Section 107 of CERCLA, the United States may recover its own response costs, damage to natural resources, and other damages. 42 U.S.C. 9607(a)(4). There is no provision for injunctive relief in Section 107 of CERCLA.

case with the 86–1571 case.[7]

On March 26, 1987, the EPA and FP & L entered into a Consent Decree pursuant to Section 106 of CERCLA. *United States v. Pepper's Steel and Alloys, Inc.*, 658 F.Supp. 1160 (S.D.Fla.1987). The Consent Decree extinguished FP & L's liability to the United States for "all claims for damages to natural resources," "all claims for response costs or damages of any sort incurred ... as of the entry of [the] Consent Decree" and all claims for future response costs or other future damages (except future damages to natural resources). *Id.* at 1167–68. In turn, FP & L agreed to undertake a cleanup of the Pepper's Steel site and to pay $300,000 to the United States, subject to certain setoffs for FP & L's cleanup expenses. *Id.* at 1164–65.

On August 21, 1987, FP & L filed a third-party complaint against certain insurers who issued it or Pepper's Steel liability insurance. In its third-party complaint, FP & L seeks a declaration that the third-party defendant insurers have an obligation, *inter alia,* to defend FP & L for the EPA actions as well as to indemnify FP & L for costs incurred by its complying with the Consent Decree.[8]

In the instant motions, the parties seek a determination of whether the environmental costs and expenses incurred in these actions constitute "damages" under the subject insurance policies.[9] USF & G, CNA, and Home, the insurers, argue that the claims to recover clean-up and response costs are not covered under the subject insurance policies because they are in the nature of restitutionary or injunctive relief, rather than legal or monetary relief. In response, the insureds, Pepper's Steel[10] and FP & L, argue that such costs are damages from the perspective of an ordinary person, and therefore, are covered by the insurance agreements. Recognizing the importance of this issue, the court entertained oral argument on the "damages" question on April 1, 1993. Before analyzing this issue, the court first shall examine the relevant provisions of the subject insurance policies in this matter.

### The Insurance Policies

USF & G issued five primary comprehensive general liability insurance policies to Pepper's Steel,[11] No. 1CC 406218, 1CC 665394, 1CC 801354, 1CC 801493, and 1CC 957152, covering the period from December 16, 1972 to December 16, 1977.[12] Each of these policies provides, in relevant part, that:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
>
> (A) bodily injury or
>
> (B) property damage
>
> to which this insurance applies, caused by an occurrence.

7. Additionally, numerous state civil actions have been filed against Pepper's Steel and Bloom alleging that various employees of Pepper's Steel suffered exposure to PCBs and other pollutants, resulting in impaired health.

8. On July 11, 1991, FP & L amended its third-party complaint against the third-party defendant insurers, adding claims against Miami Battery Manufacturing Company. The court will treat the USF & G, CNA, and Home's motions for partial summary judgment as being directed towards this amended pleading.

9. While several motions partially raise the "damages" issue, the instant motions entirely concern this question; for the sake of convenience and clarity, this order addresses these motions at this time. Additionally, this order is limited to an analysis of the "damages" issue. The court will address the remaining insurance coverage issues, including those relating to the policy exclusion provisions, in future orders.

10. For simplicity's sake, Norton Bloom, president of Pepper's Steel, and his company are referred to collectively as Pepper's Steel.

11. FP & L alleges that it is an insured, or is otherwise entitled to coverage, under the insurance policies listed in the instant motions. Moreover, while FP & L has alleged entitlement to coverage under additional policies in its amended third-party complaint, the court limits its review to the policies noted in the instant motions.

12. The 1972 USF & G comprehensive general liability policy, No. ICC 406218, states in its definitions sections that " 'damages' includes damages for death and for care and loss of services resulting from bodily injury and damages for loss of use of property resulting from property damage." This is the only subject insurance policy that includes a definition of "damages" within the definitions section.

USF & G also issued several comprehensive excess indemnity insurance policies to Pepper's Steel, No. CEP 29990, CEP 29878, CEP 46095, and CEP 65692, with coverage beginning on October 18, 1973. Each USF & G comprehensive excess indemnity policy states that:

The Company will indemnify the Insured for all sums which the Insured shall become obligated to pay as damages and expenses (all as defined herein as included within the term "ultimate net loss")[13] by reason of liability imposed upon the Insured by law, or by contractual liability, because of

(1) personal injury or property damage caused by, or

(2) advertising liability arising out of

an occurrence which takes place anywhere.

CNA issued three comprehensive general liability insurance policies to Pepper's Steel, No. CCP 2999911, CEP 3802476, and CCP 005264471, covering the period from December 16, 1977 to October 1, 1980. The language of these agreements is essentially the same as that contained in the USF & G primary liability policies.

CNA also issued three umbrella excess third-party liability policies to Pepper's Steel, No. RDV 3367621, RDV 4015541, and RDX 1788286, covering the period from December 16, 1977 to October 1, 1979. The CNA excess liability policies provide, in relevant part, that:

The company will indemnify the insured, with respect to any occurrence not covered by underlying insurance, or with respect to damages not covered by underlying insurance but which results from an occurrence covered by the underlying insurance, for

ultimate net loss in excess of the insured's retained limit which the insured shall become obligated to pay as damages by reason of liability imposed upon the insured by law or assumed by the insured under any contract because of

personal injury,

property damage, or

advertising injury

to which this coverage applies, caused by an occurrence.

Home issued an excess liability policy to Pepper's Steel, No. HEC 9328753, covering the period from December 9, 1976 to December 16, 1977. This policy agrees to afford the insured such additional insurance as the insurers of the underlying coverage. Since the policy follows the terms and conditions of the underlying USF & G excess policy, the insuring language of this Home excess liability policy is the same as the USF & G excess policies.

Home issued three liability policies directly to FP & L, No. HEC 4496013, HEC 9345717, and HEC 4496168, with coverage beginning on December 31, 1974. The insuring agreement for Home policy No. 4496013 states, in pertinent part, that:

This policy is to indemnify the named Insured and/or the Insureds as defined in the definitions for any and all sums which they shall be legally obligated to pay and shall pay or by final judgment be adjudged to pay (subject to the limitations hereinafter mentioned) to any person or persons as damages for personal injuries sustained including death at any time resulting therefrom or by reason of damage to or destruction of property, by reason of or

---

13. "Ultimate net loss" is defined in the USF & G excess indemnity policies as follows:

"ultimate net loss" means the total of all damages and expenses, as defined below, with respect to each occurrence.

(a) "damages" means all sums which the Insured, or any company as his insurer, or both, become legally obligated to pay as damages whether by reason of adjudication or settlement, after making proper deductions for all recoveries and salvages collectible, because of personal injury, property damage or advertising liability to which this policy applies; "damages" includes damages for death and for care

and loss of services resulting from personal injury or advertising liability and damages for loss of use of property resulting from property damage;

(b) "expenses" means all reasonable expenses incurred by the Insured in the investigation, settlement and defense of any claim or suit seeking such damages excluding only the salaries of the Insured's regular employees; provided "ultimate net loss" shall not include:

(1) any damages or expenses excluded by this policy, or

(2) any fines and penalties imposed by law.

resulting from any trade or business of the named Insured including the performance of services by or on behalf of such Insured in connection with said trade or business.

Home policy No. HEC 935717 provides that:

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability

(a) imposed upon the Insured by law, or

(b) assumed under contract or agreement by the Named Insured ...

for damages, direct or consequential and expenses, all as more fully defined by the term "ultimate net loss" [14] on account of:

(i) Personal Injuries, including death at any time resulting therefrom,

(ii) Property Damage

(iii) Advertising Liability

caused by or arising out of each occurrence happening anywhere in the world.

The scope of coverage for Home policy No. HEC 4496168 is the same as the other Home excess liability insurance policies issued directly to FP & L.

## II. ANALYSIS

### Summary Judgment Standard

■ Federal Rule of Civil Procedure 56(c) provides that this court should grant summary judgment to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party seeking summary judgment bears the burden of demonstrating that there is no genuine dispute as to any material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Only when that burden has been met does the burden shift to the non-moving party to come forward with sig-

nificant probative evidence demonstrating that there is indeed the existence of a triable issue of fact. *Id.*

■ In ruling on a motion for summary judgment, the court must review the facts in the light most favorable to the adverse party and give that party the benefit of all reasonable inferences drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The question for the court is "not whether there is literally no evidence, but whether there is any upon which a [trier of fact] could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (emphasis in original) (citation omitted). If there is no genuine issue of material fact, summary judgment is proper because it avoids needless litigation and promotes judicial efficiency. *Trustees of Plumbers Local No. 519 Health and Welfare Trust Fund v. Garcia*, 677 F.Supp. 1554, 1556 (S.D.Fla.1988). Summary judgment, however, is an extreme remedy which should not be granted unless the moving party has established his right to judgment beyond controversy. *Id.*

■ In the instant matter, "[t]he construction and effect of a written contract of insurance is a matter of law to be determined by the court." *Payne v. United States Fidelity & Guar. Co.*, 625 F.Supp. 1189, 1191 (S.D.Fla.1985) (citing *St. Paul Mercury Ins. Co. v. Huitt*, 336 F.2d 37 (6th Cir.1964)). Thus, the interpretation of an insurance contract "is most appropriate for summary judgment" determination by the court. *Id.; see also Hancock v. New York Life Ins. Co.*, 899 F.2d 1131 (11th Cir.1990); *Jones v. Utica Mutual Ins. Co.*, 463 So.2d 1153, 1157 (Fla. 1985).

### The Instant Controversy

The issue of whether environmental cleanup and response costs under CERCLA con-

14. This policy defines "ultimate net loss," in relevant part, as:

... the total sum which the insured, or any Company as his insurer, or both, become obli-

gated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise ...

stitute "damages" has been widely examined by both state and federal courts. State appellate courts almost uniformly have concluded that such costs are covered by insurance policies similar to the agreements in this case. *See, e.g., Coakley and Coakley Landfill, Inc. v. Maine Bonding and Casualty Co.,* 136 N.H. 402, 618 A.2d 777 (1992); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *A.Y. McDonald Industries, Inc. v. Insurance Co. of North America,* 475 N.W.2d 607 (Iowa 1991); *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g. Co.,* 326 N.C. 133, 388 S.E.2d 557 (1990); *Boeing Co. v. Aetna Casualty & Sur. Co.,* 113 Wash.2d 869, 784 P.2d 507 (1990); *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.,* 457 N.W.2d 175 (Minn.1990); *Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576 (1990); *Compass Ins. Co. v. Cravens, Dargan & Co.,* 748 P.2d 724 (Wyo.1988); *United States Fidelity & Guar. Co. v. Specialty Coatings Co.,* 180 Ill.App.3d 378, 129 Ill.Dec. 306, 535 N.E.2d 1071, *appeal denied* 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989); *CPS Chemical Co. v. Continental Ins. Co.,* 222 N.J.Super. 175, 536 A.2d 311 (1988); *Cf., Lido Co. of New England, Inc. v. Fireman's Fund Ins. Co.,* 574 A.2d 299 (Me. 1990); *Braswell v. Faircloth,* 300 S.C. 338, 387 S.E.2d 707 (Ct.App.1989).

However, federal courts, purportedly construing state law, are divided on the issue of whether such environmental costs are "damages" under standard insurance policies. Three federal circuit courts have concluded that response costs are not "damages" under comprehensive general liability policies. *See, e.g., A. Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 F.2d 66 (1st Cir.1991); *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* 842 F.2d 977 (8th Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Maryland Casualty Co. v. Armco, Inc.,* 822 F.2d 1348 (4th Cir.1987),

*cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). By contrast, four federal circuit courts have held that such costs fall within insurance policies covering "damages." *See, e.g., Aetna Casualty and Sur. Co. v. Pintlar Corp.,* 948 F.2d 1507 (9th Cir.1991); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.,* 944 F.2d 940 (D.C.Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992); *New Castle County v. Hartford Accident and Indem. Co.,* 933 F.2d 1162 (3d Cir.1991); *Avondale Indus. Inc. v. Travelers Indem. Co.,* 887 F.2d 1200 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990).

One circuit court has observed that the varying judicial conclusions on this issue may be reconciled on the basis of a common inquiry—whether the operative state's law of insurance contract interpretation requires the application of technical or legal meanings of language, or instead, invokes the common and ordinary use of language. *Independent Petrochemical Corp.,* 944 F.2d at 946. When governed by state rules of construction that invoke the technical or legal meaning of language, courts have held that the word "damages" does not cover environmental clean-up or response costs. *Id.* (citations omitted). By contrast, when a state's rules of insurance contract interpretation require the application of the common and ordinary understanding of language, courts conclude that "damages" covers such environmental costs. *Id.* (citations omitted). Thus, in deciding the instant motions, the court shall examine the principles of insurance contract interpretation under Florida law.

### Florida Principles of Construction

██ In interpreting the insurance contracts in this situation, the court is guided by several principles of construction firmly imbedded in Florida law.[15] Under Florida law, it is well settled that the terms used in an insurance policy should be read in the light of the skill and experience of ordinary people. *Brill v. Indianapolis Life Ins. Co.,* 784 F.2d

15. The court previously has recognized that Florida law governs the interpretation of the insurance policies at issue in this action. *Payne v. United States Fidelity & Guar. Co.,* 625 F.Supp.

1189, 1191 (S.D.Fla.1985); *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co.,* 668 F.Supp. 1541, 1544–45 (S.D.Fla.1987).

1511, 1513 (11th Cir.1986) (citing *Morrison Assurance Co. v. School Board,* 414 So.2d 581, 581 (Fla.Dist.Ct.App.1982) and *Stewart v. State Farm Mutual Insurance Co.,* 316 So.2d 598, 599 (Fla.Dist.Ct.App.1975)); *Midwest Mutual Insurance Co. v. Santiesteban,* 287 So.2d 665 (Fla.1973). The court should construe insurance policies in such a manner as "to provide a reasonable, practical, and sensible interpretation consistent with the intent of the parties." *Senco of Florida, Inc. v. Continental Cas. Co.,* 440 So.2d 625, 626 (Fla.Dist.Ct.App.1983) (citing *United States Fire Insurance Co. v. Pruess,* 394 So.2d 468 (Fla.Dist.Ct.App.1981)). When a policy provision is not defined, the language should be given its natural, common, and everyday meaning. *Certain British Underwriters at Lloyds of London v. Jet Charter Services, Inc.,* 789 F.2d 1534, 1536 (11th Cir.1986) (citing *Security Insurance Company of Hartford v. Commercial Credit Equipment Corp.,* 399 So.2d 31 (Fla.Dist.Ct.App.1981)). If the language of an insurance policy is unclear, confusing, or ambiguous, the language should be construed against the insurer. *Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co.,* 757 F.2d 1172, 1174 (11th Cir.1985) (citing *Landress Auto Wrecking Co. v. United States Fidelity & Guaranty Co.,* 696 F.2d 1290, 1291 (11th Cir.1983) (applying Florida law); *Rigel v. National Casualty Insurance,* 76 So.2d 285, 286 (Fla.1954); and 30 Fla.Jur. § 406 (1981)). Where the terms of a policy are susceptible of two reasonable constructions, the court should adopt the interpretation which will sustain coverage for the insured. *Pepper's Steel,* 668 F.Supp. at 1545 (quoting *Tropical Park, Inc. v. United States Fidelity and Guar. Co.,* 357 So.2d 253, 256 (Fla.Dist.Ct.App.1978)).

■ Under these principles of construction, the court reasons that Florida law clearly mandates that the terms used in an insurance contract be read in the light of its common and ordinary meaning. The subject insurance policies, except the 1972 USF & G primary liability policy, do not define the term "damages" within their definitions sections. *See Certain British Underwriters at Lloyds of London,* 789 F.2d at 1536 (citations omitted). The definition given in the 1972 USF & G primary policy is not restrictive, and it certainly does not address the legal versus equitable distinction.[16] If the insurers intended that the term "damages" have only a legal or technical meaning, they "should have so indicated in the polic[ies]. The insured[s] would then have understood that cleanup costs incurred pursuant to government mandate were not covered, and would have been able to enter into other insuring arrangements." *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g. Co.,* 326 N.C. 133, 388 S.E.2d 557, 568 (1990). Moreover, the arguments of the insurers and the insureds illustrate that the term "damages" is susceptible to two reasonable constructions, and therefore, Florida law suggests that the court adopt the interpretation which will sustain coverage for the insured. *Pepper's Steel & Alloys, Inc.,* 668 F.Supp. at 1545 (citations omitted). In short, the court shall apply the common and ordinary understanding of the term "damages," rather than its technical or legal meaning, in construing the subject insurance policies.[17]

In determining the common and ordinary meaning of a term, the court may look to the standard, nonlegal dictionary definition of the word. *See Government Employees Ins. Co. v. Novak,* 453 So.2d 1116, 1118 (Fla.1984); *Aetna Casualty & Sur. Co. v. Cartmel,* 100 So. 802, 802 (Fla.1924). The term "damages" typically is defined broadly. *See, e.g., The Random House College Dictionary* at 336 (Rev. ed. 1980) (defining damages as "the estimated money equivalent for detriment or injury sustained"); *The Random House Dictionary of the English Language* at 365 (1973) (defining damages as "the estimated money equivalent for detriment or injury

---

16. Each USF & G comprehensive excess indemnity policy contains a definition of "damages" in relation to the term "ultimate net loss." The definition of "damages" in these policies, however, also do not address the legal versus equitable meaning of the term.

17. While the language of the various policies differ (e.g. the definitions of "ultimate net loss"), the court finds that the Florida principles of construction require that all of the subject insurance policies be analyzed under the same "common and ordinary" interpretation in deciding the instant motions.

sustained" or as "cost; expense; charge"); *Webster's Third New International Dictionary* at 571 (1971) (defining damages as "the estimated reparation in money for detriment or injury sustained").[18]

The court finds that, under the plain meaning of the term, "damages" should include the environmental costs at issue in this matter, "because the term 'damages,' in common thought, does not distinguish between equitable and nonequitable relief." *Aetna Casualty and Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1513 (9th Cir.1991). "Any definition of 'damages' which is grounded upon the ancient division between law and equity—such as the definition now proffered by the insurers—would hardly be an 'ordinary and accepted meaning' in the eyes of a 'reasonably prudent layperson.'" *Id.* (quoting *Chesapeake Utilities Corp. v. American Home Assurance Co.*, 704 F.Supp. 551, 560 (D.Del. 1989) (citation omitted)).

### A Final Inquiry

While a court's application of the state's law on insurance contract interpretation typically resolves the "damages" issue, the insurers in these cases present an additional inquiry for the court's analysis—*Aetna Casualty & Sur. Co. v. Hanna*, 224 F.2d 499 (5th Cir.1955). In *Hanna*, the Hannas owned a vacant lot which they filled with boulders, trash, and dirt. In October, 1946, bad weather and high waters undermined the retaining wall on this lot, and the boulders, trash, and other materials subsequently fell unto the adjoining property. Thereafter, the Martins, the owners of the adjoining property, sued the Hannas, alleging trespass by the debris. The Martins sought, and obtained, an injunction ordering the Hannas to remove the debris. "No damages of any sort were sought by this suit." *Id.* at 501. In the subsequent action by the Hannas against the insurers under a comprehensive personal liability policy, the Fifth Circuit held that the costs and expenses incident to complying with the injunction were not covered under the policy. *Id.* at 503–04.

The application of *Hanna* to the issue presented in the instant motion for partial summary judgment has divided the lower federal courts in this state.[19] In *Hayes v. Maryland Casualty Co.*, 688 F.Supp. 1513 (N.D.Fla. 1988), the Northern District of Florida found that environmental clean-up expenses were not "damages" under the liability insurance policy in that case.[20] The court simply adopted *Hanna* as binding precedent, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), without further analysis or discussion. *Id.* at 1515.[21] *See also Gar-*

---

**18.** Interestingly, even insurance dictionaries broadly define the term "damages." *See, e.g.,* Rubins, *Barrons Dictionary of Insurance Terms* at 71 (1987) (defining damages as "the sum the insurance company is legally obligated to pay an insured for losses incurred"); Merit, *Glossary of Insurance Terms* at 47 (1980) (defining damages as "the amount required to pay for a loss").

**19.** Interestingly, while neither the Eleventh Circuit nor the Florida Supreme Court has addressed the issue presented in the instant motion, the courts have dealt with the applicability of policy exclusions for environmental contamination under insurance policies similar to those in the subject insurance policies. In *Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc.*, 935 F.2d 240 (11th Cir.1991), the Eleventh Circuit certified the question "whether, as a matter of law, the pollution exclusion clause contained in the comprehensive general liability insurance policy precludes coverage to its insured for liability for the environmental contamination that occurred in this case" to the Supreme Court of Florida. The Florida Supreme Court concluded that the term "sudden and accidental" is ambiguous as a matter of law and that coverage under the policy in that case was not precluded. *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 1993 WL 241520, 1992 Fla. LEXIS 1599, 18 Fla.L.Weekly § 400 (Fla. July 1, 1993).

**20.** A court in the Northern District of Florida recently chose not to follow *Hayes*, but instead, it held that the environmental clean-up costs are "damages." *Ranger Ins. Co. v. Perry Lumber Co.*, Case No. TCA 92–40007–WS (N.D.Fla. May 25, 1993).

**21.** In *Hayes*, the court incorrectly assumed that *Hanna* was not cited to Judge Spellman when he decided *Payne v. United States Fidelity & Guar. Co.*, 625 F.Supp. 1189 (S.D.Fla.1985) and *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co.*, 668 F.Supp. 1541 (S.D.Fla.1987). In fact, insureds in *Payne* briefed the court as to the inapplicability of *Hanna*. However, since those opinions did not address directly the "damages" issue, the instant motions are not bound by the "law of the case" doctrine.

Similarly, the court did not address the "damages" issue when it found that there was no right

*den Sanctuary, Inc. v. Insurance Co. of North America*, 292 So.2d 75 (Fla.Dist.Ct. App.1974) (following *Hanna* ). By contrast, the Middle District of Florida, in *Hudson Ins. Co. v. Double D˜Management Co.*, 768 F.Supp. 1542 (M.D.Fla.1991), did not summarily adopt *Hanna* in resolving the instant issue. Instead, the court reasoned that *Hanna* and *Garden Sanctuary* "d[o] not address the issue of whether clean-up costs under CERCLA or any other environmental statute are 'damages,' " *id.* at 1546, and therefore, the court found that the cases were "not binding precedent of this issue." *Id.* Consequently, the court in *Hudson* decided to "follow[ ] the great majority of state court decisions in holding that clean-up costs under CERCLA and other environmental statutes are covered 'damages.' " *Id.*

The court believes that the Middle District of Florida in *Hudson* properly analyzed *Hanna* in the context of environmental costs under CERCLA. In *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990), the Supreme Court of California explained why *Hanna* should not be applied in the CERCLA liability context.

[T]he basic foundation of the *Hanna* decision—the interplay of legal and equitable remedies in tort actions in which it is entirely speculative whether the plaintiff has suffered compensable harm—differs from the relationship between the various remedies authorized by CERCLA, under which injunctive relief may be available even though legal or restitutive remedies are adequate. The mere fact that the agencies seek an injunction in an environmental protection action does not indicate an absence of cognizable property damage or personal injury. The prima facie case

for injunctive relief is identical to that for reimbursement of response costs, with the single added element of "imminent and substantial endangerment" of public health or welfare or the environment. Moreover, in its remedial aspects, the injunction results in exactly the type of expenditures involved in reimbursement of response costs, whether or not the agencies have an adequate remedy in the form of reimbursement. For these reasons, it would exalt form over substance to interpret CGL [comprehensive general liability] policies to cover one remedy but not the other. Given the practical similarity of remedies available under the environmental statutes at issue here, we believe a reasonable insured would expect both remedies to fall within the coverage as "damages." Insofar as injunctive relief is an equivalent substitute for the goal of government remedial action, the distinction relied on by *Hanna* is inapposite in the CERCLA context.

*Id.*, 274 Cal.Rptr. at 844, 799 P.2d at 1277 (citations omitted). The court adopts the reasoning of *Hudson* and *AIU* in this matter.

### III. CONCLUSION

A word is a symbol of thought, but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, and it may take on values from the words and ideas with which it is associated.

*Pearson v. Pearson*, 54 Cal.2d 184, 5 Cal.Rptr. 553, 353 P.2d 33, 39 (1960).

In view of all the foregoing, the court holds that the environmental costs and expenses

---

to a jury trial under 42 U.S.C. § 9607. The determination of whether there is a right to a jury trial under the 7th Amendment is distinct from the instant matter of contract interpretation. Moreover, courts should not adhere to the "law of the case" doctrine so strictly as to produce an injustice. As this circuit recognizes:

To hold that a district court must rigidly adhere to its own rulings in an earlier stage of a case would actually thwart the purpose of the doctrine. New developments or further research often will convince a district court that it erred in an earlier ruling, or the court may

[have] simply changed its mind. We believe it would be wasteful and unjust to require the court to adhere to its earlier ruling in such an instance.

*Robinson v. Parrish*, 720 F.2d 1548, 1549–50 (11th Cir.1983); *see also United States v. Noriega*, 752 F.Supp. 444, 447 (S.D.Fla.1990) (quoting *White v. Murtha*, 377 F.2d 428, 431 (5th Cir.1967) (noting that this doctrine "is not designed to function as an 'inexorable command' ")); *Whirlpool Corp. v. U.M.C.O. Int'l Corp.*, 748 F.Supp. 1557, 1561 (S.D.Fla.1990) (quoting *Robinson* ).

incurred in this matter do constitute "damages" under the subject insurance policies. Thus, it is hereby ORDERED and AD-JUDGED that USF & G, CNA, and Home's Motions for Partial Summary Judgment (DE 275 in Case No. 86–1531–CIV–PAINE; DE 409) are DENIED. FP & L's Cross–Motion for Partial Summary Judgment as to the Effect of the Use of the Term "Damages" (DE 877) is GRANTED.

DONE and ORDERED.