**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-1282
_____

Lindsay Manufacturing Company,                            *
                                                          *
        Appellant,                    *
                                                          *
    v.                                *
                                                          *
Hartford Accident & Indemnity Co.;                   *
Hartford Insurance Company, of Illinois,             *
                                                          *
        Appellees,                    *
                                                          *
DeKalb Energy Company, a corporation, *
                                                          *
        Defendant.                    *
_____

                                      Appeal   and   Cross-Appeal
from the
    No. 96-1440          United   States   District
Court for the
        _____          District of Nebraska.

Lindsay Manufacturing Company,                            *
                                                          *
        Appellee,                    *
                                                          *
    v.                                *
                                                          *
Hartford Accident & Indemnity Co.;                   *
Hartford Insurance Company, of Illinois, *
                                                          *
        Appellants,                  *
                                                          *

DeKalb Energy Company, a corporation, *
                                       *
        Defendant.              *
                    _____

            Submitted:  December 11, 1996
                                Filed:   July 8, 1997
                    _____

Before McMILLIAN, JOHN R. GIBSON, and MAGILL,[1] Circuit
    Judges.
                    _____

MAGILL, Circuit Judge.

    Lindsay Manufacturing Company (Lindsay) appeals the
district court's grant of summary judgment to Hartford
Accident & Indemnity Company and the Hartford Insurance
Company of Illinois (collectively, Hartford) on Lindsay's
claim and Hartford's restitution counterclaim arising out
of insurance coverage for environmental cleanup costs.
Lindsay argues that the district court erred in holding
that, under Nebraska law, the "as damages" language in a
comprehensive general liability (CGL) insurance policy
does not include environmental response costs.   We
reverse and remand.

**I.**

    Lindsay is a Delaware corporation with its principle
place of business in Lindsay, Nebraska.   Currently a
publicly owned corporation, until October 12, 1988,
Lindsay was a wholly-owned subsidiary of DeKalb Ag
Research, Inc., now known as DeKalb Energy Company
(DEKALB).   DEKALB is a Delaware corporation with its

---

[1]The Honorable Frank J. Magill was an active judge at the time this case was submitted and assumed senior status on April 1, 1997, before the opinion was filed.

principal place of business in DeKalb, Illinois. Hartford Accident & Indemnity Company is a Connecticut corporation with its principal place of business in Connecticut, whereas,

Hartford Insurance Company of Illinois is an Illinois corporation with its principal place of business in Illinois.

Hartford issued two standard CGL insurance policies to DEKALB. Hartford Accident & Indemnity Company issued the primary policy, No. 83 CLR P10722E, and Hartford Insurance Company of Illinois issued an umbrella liability policy, No. 83 HU 603857, which extended coverage beyond the primary policy. The CGL policies obligate Hartford to pay all sums which the insured shall become obligated to pay "as damages" caused by an occurrence. The policies also contained a "pollution exclusion." The primary policy excluded from coverage payments that are "damages," but are not the result of environmental contamination that was "sudden or accidental." Similarly, the umbrella policy only covered contamination that was "sudden and accidental." The policies covered the period from January 1, 1982, to January 1, 1983. As a wholly-owned subsidiary of DEKALB, Lindsay was a named insured under both policies.

Lindsay's insurance claims arise out of environmental contamination emanating from its irrigation equipment manufacturing plant in Lindsay, Nebraska. Before being galvanized (zinc coated), the irrigation equipment manufactured at Lindsay's plant was cleaned or "pickled" using a bath of sulfuric acid solution know as "pickle liquor." When the pickle liquor is no longer effective, it is referred to as "spent pickle liquor." From 1972 through 1982, Lindsay disposed of its spent pickle liquor by pumping it into an open, unlined, clay-bottomed earthen waste pit.

Containing sulfuric acid, lead, chromium, and zinc, spent pickle liquor is a hazardous waste. In May 1980, the United States Environmental Protection Agency (EPA) notified Lindsay that it was a potential handler of hazardous waste and that Lindsay was therefore subject to EPA rules. In June 1980, Lindsay installed a monitoring well and samples were taken from the well in August 1980, December 1981, and June 1982. Although no contamination was detected, Lindsay's

environmental consultant, Terry Boham, told Lindsay that the well may not have been properly located to detect contamination. In December 1982, four additional monitoring wells were installed. On December 16, 1982, contamination of the aquifer was detected in one of the new wells. Sampling of the wells in January 1983 showed contamination in three of the four wells. Lindsay reported these findings to the Nebraska Department of Environmental Control (NDEC).

In the face of regulatory pressure, Lindsay entered into several stipulation agreements with NDEC. In the first of these agreements, dated April 19, 1993, Lindsay agreed to: (1) assess the extent of Lindsay's spent pickle liquor contamination of the aquifer; (2) propose a plan for remedial action and for closure of the spent pickle liquor waste pit; (3) complete the remedial action; and (4) construct a wastewater treatment facility. Lindsay submitted to NDEC a Resource Conservation and Recovery Act of 1973 § 7003 (RCRA) (also known as the Solid Waste Disposal Act), Pub. L. No. 89-272, 90 Stat. 2826 (1976) (codified at 42 U.S.C. § 6973), closure plan for the waste pit and a remedial action plan for cleaning up the contaminated groundwater. The plans were approved by NDEC on September 1, 1983, and the spent pickle liquor waste pit was certified closed on October 27, 1983.

Lindsay's second amended stipulation, dated March 7, 1984, required Lindsay to continue monthly monitoring of the aquifer and to continue to perform remedial action as necessary to restore the aquifer to background conditions as determined by NDEC. Both the first and second amended stipulations were incorporated into a January 5, 1989

Stipulation and Agreement. This agreement acknowledged the occurrence of contamination as defined by the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), codified at 42 U.S.C. §§ 9601-9675, and contained Lindsay's commitment to perform remedial work in compliance with CERCLA, the Superfund Amendments and Reauthorization Act (SARA), Pub. L. No. 99-499, 100 Stat. 1613 (1986) (codified at 42 U.S.C. §§ 9601-9675), and

Nebraska Environmental Protection Act (NEPA), Neb. Rev. Stat. §§ 81-1501 to 15,188.

Lindsay retained an independent engineering firm, Hoskins-Western-Sondergger Inc. (HWS), to investigate and develop a plan for cleaning the aquifer. HWS concluded that the contamination occurred when the monitoring wells were drilled in December 1982.

Although Lindsay began investigating the contamination in 1980 and entered into the first stipulation agreement with NDEC in 1983, Lindsay did not notify Hartford of the contamination until October 4, 1985. Lindsay claimed that the expenses incurred in the cleanup of the aquifer constituted damages under its policies with Hartford.

Hartford responded by issuing a reservation of rights letter which specifically noted only the primary policy. Hartford then commenced an investigation of the claim. Based on the balance of the evidence, Hartford recognized the claim, although Hartford did consider the theory that this was a case of cumulative contamination which would not be covered by the policy under the language of the pollution exclusion.

As part of the adjustment process, Hartford attempted to negotiate for a lump sum payment in exchange for a full and complete release. Lindsay refused Hartford's offers, however, as they represented substantially less recovery than the expenses Lindsay had incurred in the cleanup. Subsequently, Hartford and Lindsay agreed that Hartford would pay clean up costs upon submission and auditing of the billing records. The parties also agreed to arbitrate a dispute over coverage of hauling expenses

and interest.  Hartford then began to reimburse Lindsay for the costs of cleaning the aquifer.

In 1986, Hartford prosecuted a subrogation action in Lindsay's name against the engineering firm that designed the monitoring wells, the contractor that built the monitoring wells, and the subcontractor who drilled the monitoring wells.  In the

subrogation action, which was brought to recover the cost of cleaning the aquifer, Hartford alleged that the aquifer was contaminated as a result of the defendant's negligent drilling of the monitoring wells. The action was tried to a jury which found for the defendants.

In 1988, Hartford employed an independent engineering firm, R.E. Rimkus & Associates of Texas (Rimkus), to inspect the Lindsay site. Through discussions with Rimkus, Hartford learned that a NDEC government geologist, Robert Tobin, prepared a report disagreeing with HWS's, Lindsay's engineering firm, conclusion regarding the cause of the contamination. Tobin had concluded that the contamination was caused by seepage rather than the drilling of the monitoring wells. Eventually, Rimkus's written report also concluded that significant quantities of spent pickle liquor waste had migrated into the aquifer before the drilling of the monitoring wells. Nevertheless, Hartford continued to make payments.

Over time, however, Hartford also concluded that the cause of the spent pickle liquor contamination of the aquifer was not a sudden and accidental occurrence, but rather gradual seepage. Because Hartford contended that such a gradual seepage was not covered by its policy, Hartford stopped making payments. Lindsay then brought an action in state court seeking recovery from Hartford based on: (1) Hartford's breach of the CGL policies; (2) breach of a separate agreement to reimburse Lindsay for all expenses resulting from the NDEC/EPA cleanup; and (3) an equitable estoppel theory which required Hartford to continue making payments. Hartford removed the case to

the United States District Court for the District of Nebraska on the basis of diversity jurisdiction. In the district court, Hartford denied liability and counterclaimed for the payments Hartford had already made to Lindsay. On February 3, 1995, pursuant to a settlement agreement, the district court granted a motion dismissing Hartford's and DEKALB's claims against each other.

After DEKALB's dismissal from the case, Lindsay and Hartford each moved for summary judgment. On December 13, 1995, the district court granted summary judgment in favor of Hartford on Lindsay's claims. Applying the law of Nebraska in this diversity case, the district court found that although Nebraska courts have not addressed the issue, they would likely rule that the "as damages" language in the standard CGL policy does not include environmental cleanup costs under CERCLA or RICRA. Because the remedial costs of environmental cleanup are not "damages" under the policy and, thus, not covered, the district court declined to reach the question of whether the pollution exclusion bars coverage under Hartford's policy. Similarly, the district court concluded that, because environmental cleanup costs are not covered, the questions of the cause of the contamination and the notice and cooperation clauses are moot. Finally, the district court determined that Hartford is not liable to Lindsay under an estoppel theory. The district court also granted summary judgment in favor of Hartford on Hartford's counterclaim.

Lindsay appeals. We summarize Lindsay's arguments on appeal as follows: (1) in the absence of an authoritative interpretation of Nebraska law, the district court incorrectly concluded that, due to the similarities in rules of interpretation, Nebraska law is consistent with the Eighth Circuit's interpretation of Missouri and Arkansas law that CGL policies "as damages" language does not include environmental response costs; (2) Hartford and Lindsay's agreement regarding the reimbursement of cleanup expenses and the submission of disputed expenses to arbitration constituted an enforceable compromise

settlement agreement apart from Lindsay's claim under the CGL policy; (3) the district court incorrectly rejected Lindsay's claims that estoppel and waiver prevent Hartford from now asserting a policy defense to payment; and (4) Hartford is barred from recovering payments already made because Hartford made these payments as a result of a mistake of law, not a mistake of fact.[2]

---

[2]Lindsay also argues that the district court erred by not ordering the production of the settlement agreement between DEKALB and Hartford. Following the magistrate judge's ruling that the settlement documents were not discoverable, the district court denied Lindsay's appeal from this decision as moot because the district court had entered its summary judgment order disposing of Lindsay's petition and Hartford's counterclaim. See Order (Dec. 13, 1995), reprinted in I J.A. at 294. Because we reverse the district court's summary judgment orders, Lindsay's motion is no longer moot, and we reverse the district court's order and remand for consideration of the motion on the merits.

## II.

The district court's grant of summary judgment in favor of Hartford on both Lindsay's claims and on Hartford's counterclaim rests on its interpretation of Nebraska law. Lindsay argues the district court's interpretation was in error.[3] We agree.

In this diversity case, we review the district court's interpretation of Nebraska law de novo, giving no deference to the district court's interpretation of state law. See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991). When deciding the state law issue of whether the "as damages" language in a CGL policy covers environmental response costs, we are bound in our interpretations of Nebraska law by the decisions of the Nebraska Supreme Court. However, because the Nebraska Supreme Court has not yet spoken on this issue, we must attempt to predict what that court would decide if it were to address the issue. "In making our prediction, we may consider relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data." Ventura v. Titan Sports, Inc., 65 F.3d 725, 729 (8th Cir. 1995), cert. denied, 116 S. Ct. 1268 (1996).

---

[3]Lindsay also argues that Illinois law should apply. We find this argument without merit and uphold the district court's choice of Nebraska law. See Powell v. American Charter Fed. Sav. & Loan Ass'n, 514 N.W.2d 326, 332 (1994) (adopting Restatement (Second) of Conflict of Laws choice of law analysis); Restatement (Second) of Conflict of Laws §§ 6, 188, 193 (1971).

The district court began its analysis of Nebraska law by noting that the rules of construction used by the Nebraska Supreme Court are similar to those applied by this Court in <u>Continental Ins. Cos. v. Northeastern Pharm. & Chem. Co.</u>, 842 F.2d 977, 985-87 (8th Cir. 1988) (en banc) (applying Missouri law) (<u>NEPACCO</u>). <u>See</u> Mem. Op. at 12-13 (Dec. 13, 1995), <u>reprinted in</u> I J.A. at 277-78 (citing <u>Katskee v. Blue Cross Blue Shield of Nebraska</u>, 515 N.W.2d 645, 649 (Neb. 1994); <u>Union Ins. Co. v. Land & Sky, Inc.</u>, 529 N.W.2d 773, 776 (Neb. 1995)). The district court then went on to conclude that:

> in view of the similarity of the rules of construction used by courts in Nebraska, Missouri and Arkansas, this court concludes that, if presented with the issue of coverage relative to the "as damages" provisions in the policies involved in this action, the Supreme Court of Nebraska would reach the same result which was reached by the majority of the Court of Appeals in <u>NEPACCO</u>.

Mem. Op. at 13, <u>reprinted in</u> I J.A. at 278. Specifically, this Court held in <u>NEPACCO</u> that the CGL policies "as damages" language does not include environmental response costs. <u>NEPACCO</u>, 842 F.2d at 987; <u>see also</u> <u>Federated Rural Elec. Ins. Corp. v. Arkansas Elec. Coops., Inc.</u>, 48 F.3d 294, 295 (8th Cir. 1995) (applying Arkansas law).

Under Nebraska law, the rules of construction which govern the interpretation of insurance contracts are as follows:

> In our review of an insurance policy, we must

construe it as any other contract to give effect to the parties' intentions at the time the contract was made. Where the terms of such a contract are clear, they are to be accorded their plain and ordinary meaning.

Standard Fed. Sav. Bank v. State Farm Fire & Cas. Co., 537 N.W.2d 333, 338 (Neb. 1995). Where, however, "an insurance contract can fairly be interpreted in more than one way, there is ambiguity to be resolved by the court as a matter of law." Kast v.

American-Amicable Life Ins. Co. of Texas, 559 N.W.2d 460, 464 (Neb. 1997) (plurality opinion) (per curiam).[4]

Nebraska's rules of construction are substantially similar to those of Missouri. This Court in NEPACCO

---

[4]In addition,

[a]n insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the policy.

Whether a policy is ambiguous is a matter of law for the court to determine. If a court finds that the policy is ambiguous, then the court may employ rules of construction and look beyond the language of the policy to ascertain the intention of the parties. A general principle of construction, which we have applied to ambiguous insurance policies, holds that an ambiguous policy will be construed in favor of the insured. However, we will not read an ambiguity into policy language which is plain and unambiguous in order to construe it against the insurer.

When interpreting the plain meaning of the terms of an insurance policy, we have stated that the natural and obvious meaning of the provisions in a policy is to be adopted in preference to a fanciful, curious, or hidden meaning. We have further stated that while for the purpose of judicial decision dictionary definitions often are not controlling, they are at least persuasive that meanings which they do not embrace are not common.

Katskee v. Blue Cross/Blue Shield of Nebraska, 515 N.W.2d 645, 649 (Neb. 1994) (quotations and citations omitted). See also O'Neil v. Glen Falls Indem. Co., 310 F.2d 165, 167 (8th Cir. 1962) (restating Nebraska's rules of construction for insurance policies).

reviewed Missouri's rules of construction:

The rules of construction applicable to insurance contracts require that the language used be given its plain meaning. If the language is unambiguous the policy must be enforced according to such language. If the language is ambiguous it will be construed against the insurer. Language is ambiguous if it is reasonably open to different constructions; and language used will be viewed in light of "the meaning that would ordinarily be understood by the lay[person] who bought and paid for the policy."

NEPACCO, 842 F.2d at 985 (quoting Robin v. Blue Cross Hosp. Serv., Inc., 637 S.W.2d 695, 698 (Mo. 1982)).

In applying Missouri's rules of construction, the NEPACCO court first conceded that, "[v]iewed outside the insurance context, the term 'damages' is ambiguous: it is reasonably open to different constructions." NEPACCO, 842 F.2d at 985. Nevertheless, the NEPACCO court took a second step and concluded that in the insurance context "the term 'damages' is not ambiguous, and the plain meaning of the term 'damages' as used in the insurance context refers to legal damages and does not include equitable monetary relief." Id. This crucial "insurance context" second step led the NEPACCO court to its holding that under Missouri law "the federal and state governments' claims for cleanup costs under CERCLA § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), and RCRA § 7003(a), 42 U.S.C. § 6973(a), are not claims for 'damages' under these CGL policies." Id. at 987.

Some ten years after our NEPACCO decision, the Supreme Court of Missouri concluded that NEPACCO had

-19-

incorrectly stated Missouri law.  See Farmland Indus., Inc. v. Republic Ins. Co., 941 S.W.2d 505, 510 (Mo. 1997).  After articulating the applicable rules of interpretation, the Missouri Supreme Court stated:

> The NEPACCO court misconstrues and circumvents Missouri law.  The cases upon which the NEPACCO court relies for the proposition that

> "damages" distinguishes between claims at law and claims at equity are not persuasive. The cases do not determine the ordinary meaning of "damages" as required by Missouri law. Furthermore, no authority allows this Court to define words "in the insurance context." To give words in an insurance contract a technical meaning simply by reading them "in the insurance context," would render meaningless our law's requirement that words be given their ordinary meaning unless a technical meaning is plainly intended.

Id. at 510.

In addition to the Missouri Supreme Court, most federal courts construing the laws of various states have held that response costs are covered damages under CGL policies. See Bituminous Cas. Corp. v. Vacuum Tanks, Inc., 75 F.3d 1048, 1053 (5th Cir. 1996) (Texas law); Anderson Dev. Co. v. Travelers Indem. Co., 49 F.3d 1128, 1133 (6th Cir. 1995) (Michigan law); Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co., 944 F.2d 940, 946-47 (D.C. Cir. 1991) (Missouri law); Aetna Cas. & Sur. Co., Inc. v. Pintlar Corp., 948 F.2d 1507, 1511-15 (9th Cir. 1991) (Idaho law); New Castle County v. Hartford Accident & Indem. Co., 933 F.2d 1162, 1188 (3d Cir. 1991) (Delaware law); Gerrish Corp. v. Universal Underwriters Ins. Co., 947 F.2d 1023, 1029-30 (2d Cir. 1991) (Vermont law); Hays v. Mobil Oil Corp., 930 F.2d 96, 100-02 (1st Cir. 1991) (Massachusetts law); Avondale Indus. Inc. v. Travelers Indem. Co., 887 F.2d 1200, 1207 (2d Cir. 1989) (New York law); Port of Portland v. Water Quality Ins. Syndicate, 796 F.2d 1188, 1194 (9th Cir. 1986) (Oregon law).

This is to be contrasted with the NEPACCO line of cases in which this Court has held that under both Missouri and Arkansas law damages do not include response costs. See Federated Rural Elec. Ins. Corp. v. Arkansas Elec. Coops., Inc., 48 F.3d 294, 295 (8th Cir. 1995) (Arkansas law); Aetna Cas. & Sur. Co. v. General Dynamics Corp., 968 F.2d 707, 712-13 (8th Cir. 1992) (Missouri law); Grisham v. Commercial Union Ins. Co., 951 F.2d 872, 875 (8th Cir. 1991) (Arkansas law); Parker Solvents

Co., Inc. v. Royal Ins. Cos. of Am., 950 F.2d 571, 572 (8th Cir. 1991) (Arkansas law); NEPACCO, 842 F.2d at 985-87.[5]

Nevertheless, all the opinions applying the law of states other than Nebraska are simply persuasive authority in determining a question of Nebraska law. This is as true for the NEPACCO line of cases as it is for the Supreme Court of Missouri's Farmland Industries opinion. Moreover, because this is an issue governed by state law, it is not surprising that the federal courts would not have reached a uniform conclusion as to the scope of the term "as damages" in CGL policies. Indeed, as a question of state law, every state is free to reach a unique conclusion. In this case, however, Nebraska has not yet reached its own conclusion. Thus, our task remains; we must attempt to predict what the Nebraska Supreme Court would decide if it were to address the issue. See Ventura, 65 F.3d at 729.

In making our prediction, we are mindful of the many decisions which have interpreted the "as damages" language to include environmental response costs. In addition, and most persuasively, we note that several analogous decisions of the Supreme Court of Nebraska indicate that the Supreme Court of Nebraska would not take the crucial "insurance context" second step taken by this Court in NEPACCO.

---

[5]Several other federal courts have reached a similar interpretation of various states' laws. See Maryland Cas. Co. v. Armco, Inc., 822 F.2d 1348, 1352-54 (4th Cir. 1987) (Maryland law); A. Johnson & Co., Inc. v. Aetna Cas. & Surety Co., 933 F.2d 66, 69 (1st Cir. 1991) (Maine law, in dicta).

In <u>Sandy Creek Public Schools v. St. Paul Surplus Lines Ins. Co.</u>, 384 N.W.2d 279 (Neb. 1986), the Nebraska Supreme Court construed the term "money damages" in an insurance case.  We find it compelling that the court did not adopt an "insurance context" construction of the term.  Rather, the court held that:

in the situation presented in the instant case, we construe "money damages" to mean money flowing <u>from</u> the individually insured defendants and not necessarily directly <u>to</u> the plaintiffs in that case. As used in an exclusionary definition in an insurance policy, "money damages" means money sued for by a plaintiff which plaintiff prays should be paid by the insured directly to, or for the direct or indirect benefit of, the plaintiff allegedly damaged by actions of the insured. It is sufficient to constitute "money damages," in construing the exclusions in the St. Paul policy, if plaintiffs seek to have an insured pay money either to the plaintiffs or for the benefit of the plaintiffs.

<u>Id.</u> at 282 (emphasis in the original). By not adopting a construction of money damages which required that money follow directly to the plaintiff, the Nebraska Supreme Court adopted an interpretation more consistent with a layman's understanding of the term than with a technical, insurance context, definition of the term. We believe the Supreme Court of Nebraska would likewise interpret the term "as damages" within a CGL policy consistent with an ordinary layman's understanding, rather than with a technical insurance context definition.

This conclusion is bolstered by the Supreme Court of Nebraska's reasoning in <u>Katskee v. Blue Cross/Blue Shield</u>, 515 N.W.2d 645 (Neb. 1994). In <u>Katskee</u>, the court interpreted the phrase "bodily disorder or disease" within an insurance policy. The court found that the phrase was not ambiguous. <u>Id.</u> at 651. In reaching this conclusion, the court relied upon lay definitions, <u>id.</u> at 650, rather than technical medical definitions. The

-25-

court cited with particular approval <u>Cheney v. Bell
National Life</u>, 556 A.2d 1135 (Md. 1989), a case in which
the Court of Appeals for Maryland considered the
definition of "disease" with reference to hemophilia.
The <u>Katskee</u> court declared that the <u>Cheney</u> court

    recognized that the scientific community is not
    unanimous in its description and
    characterization of hemophilia. The court,
    however,

> stated that its interpretation of the term "disease" should be controlled by its ordinary and common meaning.

_Katskee_, 515 N.W.2d at 650.

Based on this demonstrated preference by the Nebraska Supreme Court for lay understandings rather than technical definitions, we conclude that, although the insurance and legal community may have a particular meaning for the term "as damages," Nebraska law does not allow that a second step be taken beyond the ordinary and common meaning. We hold that under Nebraska law the term "as damages" can "fairly be interpreted in more than one way," _Kast_, 559 N.W.2d at 464, and is therefore ambiguous. Being ambiguous, we interpret the term "as damages" to include both legal damages and equitable relief because that interpretation favors the insured. See _Katskee v. Blue Cross/Blue Shield_, 515 N.W.2d 645, 649 (Neb. 1994) ("A general principle of construction, which we have applied to ambiguous insurance policies, holds that an ambiguous policy will be construed in favor of the insured.").

Therefore, we conclude that, in the absence of an authoritative interpretation of Nebraska law, the "as damages" language in a CGL policy covers environmental response costs. Thus, under the policies at issue in this appeal and barring any policy exclusions,[6] Lindsay has a policy claim against Hartford for reimbursement for the costs of cleaning the aquifer.

---

[6] Because issues of fact remain, we are unable to determine whether the policies' pollution exclusions bar Lindsay's claims.

**III.**

Because the district court's grant of summary judgment in favor of Hartford on both Lindsay's claims and on Hartford's counterclaim rests on an erroneous interpretation of Nebraska law, the judgments are reversed. The case is remanded to the district court for further proceedings consistent with this opinion.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.